780 So.2d 367 (2001)
DIAMOND SERVICES CORPORATION
v.
Delores N. BENOIT.
No. 2000-C-0469.
Supreme Court of Louisiana.
February 21, 2001.
*368 Christopher A. Edwards, Lafayette, Counsel for Applicant.
David C. Laborde, Jeanne M. Laborde, Paulin J. Laborde, Jr., Lafayette, Max Nathan, Jr., Raymond P. Ward, New Orleans, Counsel for Respondent.
David J. Boneno, Metairie, Counsel for Louisiana Bankers Association (Amicus Curiae).
CALOGERO, Chief Justice.[*]
We granted this writ primarily to resolve a conflict among the courts of appeal over whether the maker of a collateral mortgage note is personally liable beyond the value of the mortgaged property when the collateral mortgage note is pledged to secure the debt of a third party. After reviewing the applicable law, we conclude that, within the context of the collateral mortgage package, the maker of a collateral *369 mortgage note is not personally liable beyond the value of the mortgaged property when the collateral mortgage note is pledged to secure the debt of a third party. Accordingly, we reverse the court of appeal's holding to the contrary.

FACTS AND PROCEDURAL HISTORY
On May 7, 1993, William Davenport signed two hand notes to obtain lines of credit for his corporation, International Diving and Consulting, Inc. The first hand note was in favor of Morgan City Bank and Trust Company (MC Bank) for $350,000.00. The second hand note was in favor of the plaintiff, Diamond Services Corporation, in the amount of $300,000.00. Davenport signed as guarantor on both hand notes.
On the same date, the defendant, Delores N. Benoit, a friend solicited by Davenport, executed documents comprising two collateral mortgage packages. The first collateral mortgage package was in favor of MC Bank, and consisted of a mortgage on Benoit's 410.92-acre tract of land in Acadia Parish, a collateral mortgage note or ne varietur note for $350,000.00, and a pledge of that collateral mortgage note to secure the $350,000.00 MC Bank hand note signed by Davenport. The second collateral mortgage package was in favor of Diamond Services.[1] It consisted of a mortgage on the same 410.92-acre tract, a collateral mortgage note for $300,000.00, and a pledging document, entitled "Security Agreement (Possessory Collateral)," pledging the $300,000.00 collateral mortgage note to secure the $300,000.00 Diamond Services hand note signed by Davenport. Benoit did not sign either of the hand notes executed by International Diving and guaranteed by Davenport.
Eventually, International Diving and Davenport defaulted on both hand notes. In November 1994, MC Bank recovered $192,734.00 by seizing and selling certain assets of International Diving in which MC Bank had a separate security interest. International Diving then filed for Chapter 11 Bankruptcy protection. In December 1996, MC Bank filed for executory process in Acadia Parish on its $350,000.00 collateral mortgage note, attempting to seize and sell Benoit's 410.92-acre tract. However, in May 1997, MC Bank assigned to Diamond Services all of its rights in the MC Bank hand note, the MC Bank collateral mortgage note, and its petition for executory process against Benoit filed in Acadia Parish.[2] Substituted as party plaintiff, Diamond Services caused Benoit's tract to be sold, netting $116,157.28, which was applied to the outstanding balance on the MC Bank collateral mortgage note. Thereafter, Diamond Services filed a supplemental petition against Benoit for a deficiency judgment on the MC Bank collateral mortgage note.
Regarding the Diamond Services hand note, because neither International Diving nor Davenport had made any payments on that note, Diamond Services filed a separate petition against Benoit in Lafayette Parish on its own $300,000.00 collateral mortgage note. Both suits were consolidated in Acadia Parish. In her answer to the lawsuits, Benoit denied personal liability and asserted several affirmative defenses, including division, error or mistake, failure of consideration, and fraud. Benoit also filed a reconventional demand against Diamond Services, alleging that they had defrauded her in preparing the loan documents. The reconventional demand was dismissed in July 1998 when the district court sustained Diamond Services' exception *370 of No Cause of Action to the reconventional demand.
Diamond Services and Benoit both filed motions for summary judgment, with Diamond Services alleging that it was entitled to a deficiency judgment as a matter of law against Benoit as the maker of both collateral mortgage notes, and with Benoit alleging, among other things, that the maker of a collateral mortgage note is not personally liable, and that there was mutual error on the part of the parties as to the extent of her liability. The trial court in July 1999 denied Diamond Services' motion and granted Benoit's, finding that Benoit was not personally liable on either the MC Bank collateral mortgage note or the Diamond Services collateral mortgage note, because there "was mutual error on all parties, and[] the intent and understanding by all when the documents were signed was that Ms. Benoit would not be personally responsible for the debts evidenced by the collateral packages."
The court of appeal affirmed in part, reversed in part, and remanded. The appellate court affirmed the trial court's finding that mutual error had vitiated consent with regard to the MC Bank collateral mortgage note, but it remanded the case to the trial court for a determination as to whether Diamond Services was a holder in due course of the MC Bank collateral mortgage note, in which case the defense of mutual error perhaps would not lie.[3]Diamond Services Corp. v. Benoit, 99-765 (La.App. 3 Cir. 12/8/99), 757 So.2d 23, 27. However, with regard to the Diamond Services collateral mortgage note, the court of appeal reversed the trial court's finding of mutual error, finding that Diamond Services' intentions and the terms of that note were indistinguishable, and thus any error as to Benoit's understanding of her personal liability exposure regarding that note was unilateral, not mutual. Id. Further, the court of appeal held that Benoit, as the maker of the collateral mortgage note pledged to secure the indebtedness of another, was personally liable for the debt, and that such personal liability was limited to the lesser of the face amount of the collateral mortgage note and the amount owed in connection with the hand note. Id. at 28. Finally, the appellate court reversed the trial court's judgment sustaining the exceptions against Benoit's reconventional demand alleging fraud, reinstated the reconventional demand, and remanded for further proceedings on that issue.

DISCUSSION
We granted Benoit's writ application to resolve a conflict among the circuits regarding whether the maker of a collateral mortgage note pledged to secure the indebtedness of a third party is personally liable on the collateral mortgage note beyond the value of the mortgaged property. Diamond Services Corp. v. Benoit, 00-0469 (La.4/20/00), 759 So.2d 768. As Amicus Curiae acknowledges,[4] the issue of the personal liability of the maker of a collateral mortgage note pledged to secure a third party's hand note is an "unclear and confusing area of the law." Amicus Br., p. 7. Although there have been several conflicting court of appeal opinions, the precise legal question has not been addressed, or resolved, by this court.

I.
The collateral mortgage, though now recognized by statute,[5] is a form of conventional mortgage that was developed by Louisiana's practicing lawyers and has long been recognized by Louisiana courts. Levy v. Ford, 41 La.Ann. 873, 6 So. 671 (La.1889); Merchants' Mut. Ins. Co. v. Jamison, 25 La.Ann. 363 (La.1873); Succession *371 of Dolhonde, 21 La.Ann. 3, 1869 WL 4559 (La.1869). The collateral mortgage arose out of the need for a special form of mortgage to secure revolving lines of credit and multiple present and future cross-collateralized debts for which there was no provision in the Civil Code. David S. Willenzik, Future Advance Priority Rights of Louisiana Collateral Mortgages: Legislative Revisions, New Rules, and a Modern Alternative, 55 La. L.Rev. 1, 7 (1999). The collateral mortgage was designed "to create a mortgage note that can be pledged as collateral security for either a pre-existing debt, or for a debt created contemporaneously with the mortgage, or for a future debt or debts, or even for a series of debts." Max Nathan, Jr. & H. Gayle Marshall, The Collateral Mortgage, 33 La. L.Rev. 497 (1973). One advantage it holds for creditors is that liabilities are ranked from the date of the original pledge of the collateral mortgage note (assuming the mortgage has been recorded), rather than from the date of the individual, subsequent advances. Further, the creditor is able to secure multiple present and future loans and obligations on a cross-collateralized basis.
This Court discussed the fundamentals of a collateral mortgage in First Guaranty Bank v. Alford, 366 So.2d 1299, 1302 (La. 1978), as follows:
A mortgage is an accessory right which is granted to the creditor over the property of another as security for the debt. La.Civ.Code arts. 3278, 3284. Mortgages are of three types: conventional, legal and judicial. La.Civ.Code art. 3286. Within the area of conventional mortgages, three different forms of mortgages are recognized by the Louisiana statutes and jurisprudence: an "ordinary mortgage" (La.Civ.Code arts. 3278, 3290); a mortgage to secure future advances (La.Civ.Code arts. 3292, 3293); and a collateral mortgage. See Thrift Funds Canal, Inc. v. Foy, 261 La. 573, 260 So.2d 628 (1972). Unlike the other two forms of conventional mortgages, a collateral mortgage is not a "pure" mortgage; rather, it is the result of judicial recognition that one can pledge a note secured by a mortgage and use this pledge to secure yet another debt.
A collateral mortgage indirectly secures a debt via a pledge. A collateral mortgage consists of at least three documents, and takes several steps to complete. First, there is a promissory note, usually called a collateral mortgage note or a "ne varietur" note. The collateral mortgage note is secured by a mortgage, the so-called collateral mortgage. The mortgage provides the creditor with security in the enforcement of the collateral mortgage note.
Up to this point, a collateral mortgage appears to be identical to both a mortgage to secure future advances and an ordinary mortgage. But a distinction arises in the collateral mortgage situation because money is not directly advanced on the note that is paraphed for identification with the act of mortgage. Rather, the collateral mortgage note and the mortgage which secures it are pledged to secure a debt.
366 So.2d at 1302 (emphasis in original).
Pledge is an accessory contract by which one debtor gives something to a creditor as security for the debt. La.Civ. Code art. 3133; Texas Bank of Beaumont v. Bozorg, 457 So.2d 667, 671 n. 4 (La. 1984). Invariably, the thing given as security for the debt is a movable, in which case the contract is more accurately called pawn.[6] La.Civ.Code arts. 3134 and 3135. A person may give a pledge not only for his own debt, but also for that of another. La.Civ.Code art. 3141. The pledge secures only that debt or debts contemplated in the contract between the pledgor and pledgee. Alford, 366 So.2d at 1304 (quoting *372 Durham v. First Guaranty Bank of Hammond, 331 So.2d 563, 565 (La.App. 1st Cir.1976)); see also Peter S. Title, Louisiana Real Estate Transactions, Second Edition, § 14.9 (2000).
A collateral mortgage is not a "pure" mortgage; instead, it combines the security devices of mortgage and pledge into one. First Federal Savings & Loan Ass'n v. Moss, 616 So.2d 648, 654 (La. 1993). It is important to remember that the collateral mortgage does not directly secure a debt; instead, the collateral mortgage device "is designed to create a mortgage note for a fictitious debt that can be pledged as collateral security for a real debt." Bozorg, 457 So.2d at 671; see also David S. Willenzik, Louisiana Secured Transactions, § 2:13 (2000) ("The borrower's mortgage secures a fictitious collateral mortgage note, which is payable to bearer on demand. The collateral mortgage note is then pledged under a collateral pledge agreement to secure the borrower's true indebtedness under one or more hand notes."). Because the mortgagor, after executing the collateral mortgage and the collateral mortgage note, then pledges the collateral mortgage note as security for a debt, usually represented by a separate hand note,[7] the collateral mortgage package combines the security devices of pledge and mortgage. Bozorg, 457 So.2d at 671 (citing Nathan & Marshall, The Collateral Mortgage, 33 La.L.Rev. at 498).[8]

II.
The dispute in this case centers around the obligation that arises from the making of the collateral mortgage note when that note is pledged to secure the debt of a third party represented by a hand note executed by that third party.[9] Our courts of appeal have differed in resolving disputes in this area, yet this court has not spoken on the issue. The lack of resolution at this level prompted our writ grant.
The Third Circuit in Bank of Lafayette v. Bailey, 531 So.2d 294 (La.App. 3 Cir.), granted in part, 533 So.2d 5 (La.1988), was the first Louisiana court to suggest that the collateral mortgage note, when pledged to secure the debt of a third party, might create a personal obligation that exposes the maker to liability above and beyond the value of the mortgaged property. In Bailey, a husband and wife executed a collateral mortgage of immovable community property and a collateral mortgage note in the amount of $250,000, which they later pledged to secure any indebtedness of the husband up to $250,000. The husband defaulted on a subsequently executed hand note, resulting in a seizure and sale of the mortgaged property and a deficiency judgment against the wife for the unsatisfied portion of the hand note. Finding the wife personally liable for the deficiency, the Bailey court held that "the collateral mortgage note being pledged for an obligation evidenced by the hand note executed by the [husband] bound both in solido, for the payment of that obligation up to the full amount of the collateral mortgage note." 531 So.2d at 298 (citing *373 Zibilich v. Rouseo, 157 La. 936, 103 So. 269 (1925); Chaffe v. Whitfield, 40 La.Ann. 631, 4 So. 563 (1888)).[10]
The Bailey court's reasoning, however, was effectively set aside when this court granted the wife's writ application in part and reversed the Third Circuit's finding of the wife's liability beyond the value of the mortgaged property. After granting the writ in part, we held that "[t]he personal liability of [the wife] is limited to the mortgaged property and the community property; as the bank's printed collateral mortgage form states, it `does not create any liability with regard to the separate property of spouse intervenor.'" Bank of Lafayette v. Bailey, 533 So.2d 5 (La.1988).
Before we granted the writ in Bailey, however, the Third Circuit applied its reasoning to another case. In Concordia Bank & Trust Co. v. Lowry, 533 So.2d 170 (La.App. 3 Cir.1988), rev'd in part on other grounds, 539 So.2d 46 (La.1989), the Third Circuit again addressed the issue of the personal liability of the maker of a collateral mortgage note and seemingly made explicit the rationale underlying its holding in Bailey: the maker of the collateral mortgage note is personally liable thereon and her liability is not limited to the value of the mortgaged property.[11] In Lowry, six family members executed a collateral mortgage and a $100,000 collateral mortgage note, which was pledged to secure the future indebtedness of any of the mortgagors. One member executed a hand note in the amount of $61,859.67, but later defaulted on that note, thereby resulting in a judgment of $74,453.14 against the six makers of the collateral mortgage note. The judgment as to the appellants, three of the six family members, was taken by default upon their failure to answer the lender's suit.
In affirming the liability of the family members, the Lowry court, without citing any authority other than its own decision in Bailey, and in a case where it is not clear that the appellate court needed to reach the issue, see n. 11, supra, reasoned as follows:
While it is established that the hand note is the debt instrument in a collateral mortgage arrangement, it is equally clear that the maker of a collateral mortgage note is personally liable thereon. A collateral mortgage note ... is a negotiable instrument. The mere fact that it is paraphed for identification with a collateral mortgage does not alter its nature or effect. Accordingly, the collateral mortgage note creates a personal obligation for which the maker is liable. It therefore follows that even though the debt is incurred in connection with a hand note in a collateral mortgage arrangement, the maker of the collateral mortgage note is personally liable for the indebtedness owed. However, such personal liability is limited to the lesser of the face amount of the collateral mortgage note and the amount owed in connection with the hand note.
533 So.2d at 172-73.
Despite this pronouncement, the author of the Lowry opinion, Judge Foret, gave additional reasons in a concurrence to question the correctness of Bailey and the proposition that the maker of a collateral mortgage note may be held personally liable, as opposed to liable solely to the extent of the value of the mortgaged property, as a result of a third party's default on the hand note:

*374 I have always believed, in my thirty years of law practice and on the bench, that the maker of a collateral mortgage and note which is pledged to a lender to secure the debt of a third party, does not render the maker personally liable to the lender in the event of default by the third party, beyond the value of the property mortgaged.
It seems to me that to hold the maker personally liable would require more than the mortgage and note, and pledge thereof. To hold the maker personally liable over and above the value of the property amounts to personal suretyship, which must be express in no uncertain terms. Nothing is clearer in our law than that suretyship must be express. I doubt that suretyship would be found in this case. However, since judgment went by default, a fortiori, that defense was not raised by appellants, and thus was not considered on appeal. But, my judgment tells me that appellants did not know or intend that they could possibly be held personally liable above and beyond the value of the mortgaged property.
533 So.2d at 175-76, Foret, J., concurring.
Notwithstanding our writ grant and partial reversal in Bailey, and Judge Foret's concurring reasons in Lowry,[12] the Third Circuit in Merchants & Farmers Bank & Trust v. Smith, 559 So.2d 845, 847 (La. App. 3 Cir.), writ denied, 563 So.2d 865 (La.1990), reiterated its position that the maker of the collateral mortgage note is personally liable for the indebtedness sued upon, up to the full amount of the collateral mortgage note. There, Smith and Rivers executed a collateral mortgage and note in the amount of $15,000, mortgaging property owned by Rivers to secure future advances to either party. Smith executed a hand note in the amount of $13,500, which Rivers endorsed on the reverse. When Smith failed to pay the note, the bank called on Rivers to pay. The bank sued Rivers on the collateral mortgage note for the indebtedness due under the hand note, and asked for recognition of its mortgage on the property. Rivers denied liability beyond the value of the property, and further alleged that the parties had intended to limit his liability to the value of the mortgaged property.
Relying on its prior decisions in Bailey and Lowry, the majority of the court made a finding that Rivers was indeed personally liable up to the full amount of the collateral mortgage note.[13] 559 So.2d at 847. The majority also affirmed the trial court's finding that there had been no agreement between the parties to limit Rivers's liability. Judge Foret dissented, believing that there had in fact been such an agreement. As to the legal issue presented, Judge Foret noted that this court had yet to determine the extent of the liability of the maker of the collateral mortgage note and that the issue was thus unsettled. 559 So.2d at 849, Foret, J., dissenting.
Contrary to the Third Circuit's stance on the issue, the Second Circuit takes the view that the maker of the collateral mortgage note is liable only up to the value of the mortgaged property. Commercial Nat'l Bank v. Succession of Rogers, 628 So.2d 33 (La.App. 2 Cir.1993). In Succession *375 of Rogers, three men executed a hand note in the amount of $350,000. Two days later, the three men and their wives executed a collateral mortgage and note in the amount of $500,000, which was pledged to secure the hand note. The lender foreclosed on the mortgage. The sheriff's sale of the property netted $148,529.27. The lender then unsuccessfully petitioned for a deficiency judgment.
In affirming that ruling, the Second Circuit rejected the Third Circuit's position and held that the maker of a collateral mortgage note who does not execute the hand note has no liability beyond the value of the mortgaged property. Succession of Rogers, 628 So.2d at 36-37. To reach a contrary result, the court noted, it would have to find that the wives had executed both a pledge of the mortgaged property and a personal guaranty of payment of the underlying indebtedness and any future advances made. The court reasoned that the bank could have personally obligated the wives by requiring that they sign the hand note as co-makers or that they execute some other document guaranteeing payment of the underlying debt and expressing an intent to be personally bound. Id. at 37.[14]
The Fifth Circuit also takes the view that the maker of a collateral mortgage note is not personally liable on such note when it is used to secure the debt of a third party. In Bank of New Orleans & Trust Co. v. H.P.B., Jr. Development Co., 427 So.2d 486 (La.App. 5 Cir.1983), the maker of a collateral mortgage note also signed the back of the hand note. However, the court noted that the collateral mortgagor "executed the back of the hand note only to effectuate the pledge of the collateral mortgage note secured by the collateral mortgage, as recited, and [the collateral mortgagor] did not execute or endorse as a co-maker or solidary surety." Id. at 490. "In other words, [the collateral mortgage] was in rem and [the collateral mortgagor] had no in personam liability." Id.
Furthermore, at least one federal court, after an in depth assessment of all Louisiana cases and law review articles on point, has held that the maker of a collateral mortgage and collateral mortgage note is not personally liable beyond the value of the mortgaged property when the collateral mortgage note is pledged as security on behalf of a third party. Pontchartrain State Bank v. Lybrand, 799 F.Supp. 633 (E.D.La.1992). In Lybrand, the four defendants executed an act of collateral mortgage against property in St. Tammany Parish and a collateral mortgage note. The collateral mortgage note was then pledged to secure a hand note executed by one of the defendants. In concluding that the makers of the collateral mortgage and note were not personally liable on the debt represented by the hand note, the court reasoned that the maker of the collateral mortgage and collateral mortgage note is typically not asked to co-sign the hand note because there is a common understanding that liability is limited to the value of the property that stands behind the collateral mortgage. Id. at 640.
*376 Granted, the Louisiana Third Circuit in a trilogy of cases has expounded on the issue of the extent of the maker's liability on a collateral mortgage note pledged to secure the debt of a third party. However, the Louisiana Second Circuit, the Louisiana Fifth Circuit, and the United States District Court for the Eastern District of Louisianaone might say a majority of the courts that have addressed the issue have concluded that such a note generally does not create personal liability beyond the value of the mortgaged property, absent some additional document or agreement that provides for such liability.

III.
Early commentators discussing the collateral mortgage package understood that the collateral mortgage note itself did not represent the indebtedness; instead, the collateral mortgage note was merely pledged to secure the actual indebtedness. In 1973, Max Nathan and Gayle Marshall explained:
the "ne varietur" note is not the indebtedness at all: the "ne varietur" note, rather, is only to be used as collateral, the security that is pledged to the creditor to secure another note. The true indebtedness is the debt that the collateral mortgage "ne varietur" note is pledged to secure. Thus, while the "ne varietur" note is generally a note payable on demand, it does not represent a specific debt .... the terms and conditions of the hand note represent the indebtedness and govern the payment schedule for the borrower.
Nathan and Marshal, The Collateral Mortgage, 33 La.L.Rev. at 505. Professor Crawford was even more explicit, stating that "[t]he collateral mortgage note itself represents no obligation or indebtedness at all." William E. Crawford, Forum Juridicum, Executory Process and Collateral Mortgages, Authentic Evidence of the Hand Note?, 33 La.L.Rev. 535, 536 (1973).
It was only after some courts of appeal began to ascribe qualities of a negotiable instrument to the collateral mortgage note that the opinions of certain commentators evolved to suggest that the collateral mortgage note is a separate debt instrument that creates a personal obligation beyond the value of the mortgaged property.[15] For example, Max Nathan and Anthony Dunbar in 1988, relying on Central Bank v. Bishop, supra, and Central Progressive Bank v. Doerner, supra, posited:
It is now quite clear that the ne varietur note is not a meaningless piece of *377 paper. The note is indeed an enforceable obligation even though it does not represent the indebtedness of the borrower. No primary obligation is brought into existence by the mere execution of a collateral mortgage and a ne varietur note. The enforceability as well as the ranking of the mortgage depends upon "issuance" (the pledge of the ne varietur note). Nonetheless, the ne varietur note is a separate, viable negotiable instrument that may give rise to personal liability on the part of the maker.
Max Nathan, Jr. and Anthony P. Dunbar, The Collateral Mortgage: Logic and Experience, 49 La.L.Rev. 39, 41-42 (1988); see also Michael H. Rubin, The Work of the Louisiana Appellate Courts for the 1978-1979 TermA Faculty Symposium: Security Devices, 40 La.L.Rev. 572, 582 (1980).
While we agree that the enforceability of the collateral mortgage note depends upon the pledge of that note, we do not agree that the Bishop and Doerner cases jurisprudentially changed, or even more fully explained, the original nature and purposes of the collateral mortgage package in regard to the issue presented to us today. That issue, as previously set forth, is whether the maker of the collateral mortgage note is personally liable beyond the value of the mortgaged property when the note is pledged to secure the obligation of a third party. The fundamental error in the reasoning of the Third Circuit and the arguments of respondent in this case is the misunderstanding that the collateral mortgage note is "just like any other promissory note." The collateral mortgage note itself is not a separate debt instrument; nor is it just like any other promissory note. As we stated in Alford:
That the collateral [mortgage] note was in effect a negotiable bearer instrument, a matter which we initially found troubling, is of no moment. It was not a debt instrument, but a security device, a pledge instrument.
Alford, 366 So.2d at 1303.
In Alford, this court held that, where an act of pledge limited the collateral mortgage note to a hand note that had been extinguished by payment, the creditor could not sue the maker of the collateral mortgage note for default of any subsequent hand notes, even though the creditor retained possession of the collateral mortgage note, and the subsequent hand notes stated that they were secured by a pledge of the collateral mortgage note. 366 So.2d at 1303. We thus recognized that the plaintiff-bank's retention of the pledged collateral mortgage note alone, with no underlying debt represented by a hand note, gave the bank no security interest in the collateral mortgage note. Our reasoning was in part based on the fact that the collateral mortgage note, unlike other promissory notes, is not a separate, enforceable instrument of which possession alone is sufficient to create a security interest. See La.Rev.Stat. 10:9-305(1) ("A security interest in ... goods, instruments (other than certificated securities), money, negotiable documents, or chattel paper may be perfected by the secured party's taking possession of the collateral.").
A collateral mortgage note standing alone is virtually meaningless, as it has no intrinsic value and evidences no debt or obligation actually owed by or to anyone. Only when viewed in the context of the entire collateral mortgage package, with all of the component parts present, does the collateral mortgage note take on meaning. "Without an act of mortgage, there can be no mortgage note; without a mortgage note, there is no collateral to be pledged; without the pledge of the note, the mortgage is dormant and there is no obligation secured by the mortgage." Nathan and Marshall, The Collateral Mortgage, 33 La.L.Rev. at 521. As we explained in Bozorg, the collateral mortgage note is a "fictitious debt that can be pledged as collateral security for a real *378 debt." 457 So.2d at 671. Therefore, the collateral mortgage note differs from a typical promissory note in that, on its own, it does not represent any indebtedness by the maker.
The origins and purposes behind the evolution of the collateral mortgage support our view that the collateral mortgage note was not conceived as being a separate enforceable instrument like other promissory notes. The collateral mortgage device evolved in the nineteenth century to provide a flexible mechanism by which revolving lines of credit and other future obligations could be secured. See Rubin, Willenzik, and Moore, Is the Collateral Mortgage Obsolete?, 41 La. B.J. at 530. This security device was developed by practitioners in order to overcome limitations that then existed in the codified mortgage to secure future advances. See Nathan and Marshall, The Collateral Mortgage, 33 La.L.Rev. at 498. The collateral mortgage package was designed "to create a mortgage note that can be pledged as collateral security for either a pre-existing debt, or for a debt created contemporaneously with the mortgage, or for a future debt or debts, or even for a series of debts." Id. Hence, the collateral mortgage note was not envisioned as a separate, enforceable promissory note, but was created as a component part of the entire collateral mortgage mechanism, providing flexibility in securing future advances while allowing creditors to make those advances safely and without fear of being primed by intervening creditors because of the retroactive ranking to the date of issuance or pledge of the collateral mortgage note. Id. As Judge McNamara reasoned in Lybrand:
The entire collateral mortgage scheme is one designed for the benefit of creditorsto achieve retroactive ranking of future advances. The collateral mortgage note, even though it is styled a negotiable instrument, is a mere formality in that overall scheme. To allow a creditor then to use that device to impose personal liability beyond the value of the mortgaged property is, at a minimum, to sanction the circumvention of Louisiana's strict requirement that personal suretyship be express.
Lybrand, 799 F.Supp. at 640-41.
Professor Slovenko in 1958 in examining the contract of pledge stated as follows:
One who gives a thing in pledge to guarantee the debt of another does not oblige himself personally, but he may, of course, also sign as a surety and thus be personally responsible for the obligation....
One who pledges a thing for the obligation of another resembles a surety, with the difference that the surety answers with all his property, because he is held personally, whereas a person who gives a thing in pledge for a debt not his own does not engage himself personally but only the thing that he gives to the creditor: res non persona debet. From this point of view, the pledge by a third person is less onerous than the surety.
Slovenko, Of Pledge, 33 Tul.L.Rev. at 66 (footnotes omitted). In arguing that the lender may choose either to foreclose against the immovable property or to sue on the collateral mortgage note, especially the latter when the proceeds from a forced sale are insufficient to satisfy the third party's debt, Nathan and Dunbar have similarly reasoned that the maker of the collateral mortgage note when he pledges the note to secure the debt of a third party "become[s] a kind of surety" for the debtor. The Collateral Mortgage: Logic and Experience, 49 La.L.Rev. at 43.
However, suretyship, an accessory contract by which a person binds himself to a creditor to fulfill the obligation of another when the latter fails to do so, must be express and in writing. La.Civ.Code arts. 3035 and 3038; Kaplan v. University Lake Corp., 381 So.2d 385, 391 (La.1979) (on rehearing). We disagree that the collateral mortgage package has recently morphed into de facto suretyship for the *379 third party simply because the collateral mortgage note may have some of the attributes of an ordinary negotiable instrument.[16]

IV.
Nor do we find any support for the proposition that the collateral mortgage note creates a personal obligation beyond the value of the mortgaged property in the recent adoption of the Uniform Commercial Code, Article 9, and the corresponding changes to Louisiana securities law. By Act 135 of 1989, the legislature enacted into law a modified version of Article 9 of the Uniform Commercial Code (U.C.C.) as Chapter 9 of the Louisiana Commercial Laws. La.Rev.Stat. 10:9-101 et seq. As a general rule, Article 9 applies to contractual security interests affecting personal or movable property, including the pledge of a real estate mortgage note, that are entered into or granted on or after January 1, 1990. La.Rev.Stat. 10:9-102; Acts 1989, No. 135, § 12. However, security interests affecting real estate or immovable property, including collateral real estate mortgages, are excluded from coverage under Article 9, and are subject to other statutory authority. La.Rev.Stat. 10:9-104(j). Since Article 9 applies only to the pledge of the collateral mortgage note, and not to the mortgage of real property, commentators have noted that it has limited application to the post 1989 collateral mortgage security device. Willenzik, Louisiana Secured Transactions, § 2:14 (pledge of collateral mortgage note affected primarily by the possession perfection requirements for a U.C.C. security agreement); see also Willenzik, Future Advance Priority Rights of Louisiana Collateral Mortgages: Legislative Revisions, New Rules, and a Modern Alternative, 55 La.L.Rev. at 31-38; Title, Louisiana Real Estate Transactions, Second Edition, §§ 14:1414:17. We can find nothing in Article 9 of the Louisiana U.C.C. that addresses the extent of the liability of the maker of a collateral mortgage note pledged to secure the debt of a third party.
Act 137 of 1989, known as the U.C.C. Implementation Bill, was designed to facilitate implementation of Article 9 of the U.C.C. by amending various existing Louisiana security device laws to clarify that these laws would continue to apply to then outstanding transactions and security interests. Willenzik, Future Advance Priority Rights of Louisiana Collateral Mortgages: Legislative Revisions, New Rules, and a Modern Alternative, 55 La.L.Rev. at 23-24. Yet, the legislature clearly recognized the special creature of the collateral mortgage, and therefore continued the juridical invention of the collateral mortgage by providing for it by statute. See La. R.S. 9:5550 et seq. This legislative definition, however, does not implicate the extent of the liability of the maker of the collateral mortgage note pledged to secure the debt of another.
In La.Rev.Stat. 9:5550(1), a "collateral mortgage" is described as "a mortgage that is given to secure a written obligation, such as a collateral mortgage note, negotiable or nonnegotiable instrument, *380 or other written evidence of a debt, that is issued, pledged, or otherwise used as security for another obligation." La. Rev.Stat. 9:5550(1). This definition of a collateral mortgage certainly recognizes that the paraphed collateral mortgage note is a "written obligation"; however, it does not necessarily follow that the collateral mortgage note must be a negotiable promissory note. A collateral mortgage may secure a "negotiable or nonnegotiable instrument or other written evidence of a debt, that is issued, pledged, or otherwise used as security for another obligation." La.Rev.Stat. 9:5550(1). Although the legislature codified many of the rules applicable to collateral mortgages that were previously found only in case law, Willenzik, Louisiana Secured Transactions, § 2.14, we do not find any indication in either Act 137 of 1989 or its legislative history that the legislature intended to rewrite collateral mortgage law or to provide that a collateral mortgage note is to be treated the same as any other negotiable instrument, when there are inherent differences between a collateral mortgage note and other notes.[17]

V.
The Civil Code establishes two primary sources of law in Louisiana: legislation and custom. See La.Civ.Code art. 1; Revision Comment (b), La.Civ.Code art. 1. Custom, which may not abrogate legislation, results from practice repeated for a long time and generally accepted as having acquired the force of law. La.Civ.Code art. 3. The issue before us, as we noted above, has not been addressed by the legislature. And, despite what we deem to be a long practice, we cannot say that the limited extent of the maker's liability on a collateral mortgage note pledged to secure the debt of another is a matter of customary law, given the somewhat conflicting juridical sentiment on the issue. Therefore, we must proceed according to equity, as directed by La.Civ.Code art. 4. To decide equitably, resort is made to justice, reason, and prevailing usages. La.Civ. Code art. 4.
With these principles in mind, we decide today that personal liability beyond the value of the mortgaged property does not generally arise on the collateral mortgage note when the note is pledged to secure the obligation of a third party. The two judges that have specifically discussed the prevailing usage of the collateral mortgage package, Judge Foret, see supra, pp. 373-74, and Judge McNamara, see supra, p. 378, have recognized that in the typical situation the liability exposure of the maker of the collateral mortgage note does not exceed the value of the mortgaged property when the note is pledged to secure the debt of another. Judge McNamara observed in Lybrand that, since the inception of the collateral mortgage as a judiciallyrecognized security device, there has been a "common understanding that liability [of the maker of the collateral mortgage note pledged to secure the debt of a third party] is limited to the value of the property that stands behind the collateral mortgage." 799 F.Supp. at 640. Additionally, one commentator has noted that, "in view of the fact that the collateral mortgage note is not evidence of the actual debt, undoubtedly, as a matter of custom and usage in Louisiana makers of collateral mortgage notes who have not guaranteed, co-signed or endorsed the hand note have not considered themselves to be personally liable." Title, Louisiana Real Estate Transactions, Second Edition, § 14:61, at 14-47. The strength of the authority on *381 this issue leads us to conclude that, for well over a hundred years, this practitioner-created and judicially-recognized "hybrid" security device, the collateral mortgage and the subsequent pledge of the collateral mortgage note, has customarily not, absent some additional agreement, brought into play the personal liability of the maker of the collateral mortgage note, beyond the value of the property mortgaged, when the note is pledged to secure the debt of another.
Furthermore, the facts of the instant case, we believe, are typical of collateral mortgage packages used by Louisiana's practicing attorneys. Here, as in the ordinary collateral mortgage situation, the parties understood that the liability of the maker of the collateral mortgage note, paraphed ne varietur to identify it with the act of collateral mortgage, does not extend beyond the value of the mortgaged property when the note is pledged to secure an obligation of a third party. Attorney Andrew Reed, who prepared the collateral mortgage packages for both MC Bank and Diamond Services, testified that the documents he drafted were not documents he would use to bind the maker of the collateral mortgage note personally beyond the value of the mortgaged property. Reed, with twenty-three years of legal practice in banking and real estate law in Louisiana, confected each collateral mortgage package at the direction of his clients, in this case MC Bank and Diamond Services, respectively.[18] Reed explained that, had his clients and he desired to make Benoit personally liable, beyond the value of the mortgaged property, for the obligations of International Diving and Davenport, he would have had Benoit execute an additional document, such as a continuing guaranty, or have her endorse the hand note or sign the hand note as a co-maker. Reed was not directed by either MC Bank or Diamond Services to obtain liability on the collateral mortgage notes beyond the value of the mortgaged property. Consequently, he did not prepare documents to achieve that objective. Instead, Reed used standard forms for the collateral mortgage package, believing that additional documents would be necessary to impose personal liability upon Benoit.
The actions of both MC Bank and Diamond Services further establish that the collateral mortgage documents before us were not confected to impose liability upon Benoit beyond the value of the property. The bank did obtain an appraisal of the 410.92-acre tract of land in Acadia Parish, and the property was valued at $119,000.00 at the time the mortgages and notes were executed. However, neither the bank nor Diamond Services (which knowingly took a secondary position on the mortgage) required Benoit to provide a financial statement or otherwise determined whether she had sufficient resources to satisfy the full amounts of the two collateral mortgage notes, totaling $650,000.00, executed by her that day. This inaction suggests that neither lender expected that the collateral mortgage packages as confected by Attorney Reed would impose liability upon Benoit beyond the value of the property mortgaged.
Additional support for the proposition of limited liability for the maker of the collateral mortgage note pledged to secure the obligation of a third party comes from Revision Comment (b) to La. Civ.Code art. 3297. The comment instructs that, when a mortgage is given to secure another person's obligations, the mortgagor is not personally liable for the obligations of the debtor unless he personally undertakes them. Title, Louisiana Real Estate Transactions, Second Edition, § 14:60. The collateral mortgage package as a security device combines the security devices of both mortgage and pledge, and the collateral mortgage note therein is but a fictitious debt designed to facilitate the pledge to secure the actual debt. In both mortgage and pledge, when the mortgagor *382 or pledgor elects to secure the obligation of a third party, neither the mortgagor nor the pledgor is personally liable beyond the value of the property mortgaged or the thing pledged. Similarly, the collateral mortgage note, specifically designed to benefit creditors through ranking privileges and cross-collateralization clauses, should also not impose personal liability beyond the value of the mortgaged property when the note is pledged to secure the debt of a third party.[19]

CONCLUSION
We conclude that, within the context of the collateral mortgage package, the maker of a collateral mortgage note, paraphed ne varietur for identification with the act of collateral mortgage, is not personally liable beyond the value of the mortgaged property when the collateral mortgage note is pledged to secure the debt of a third party, absent some additional agreement so binding the maker of the collateral mortgage note.

DECREE
For the reasons stated herein, the judgment of the court of appeal holding that the maker of a collateral mortgage note pledged to secure the debt of a third party is personally liable on the collateral mortgage note beyond the value of the mortgaged property is reversed. The judgment of the district court, dismissing with prejudice respondent Diamond Services' consolidated petitions, is reinstated.
REVERSED AND RENDERED.
VICTORY, J., concurs in the result with reasons.
MARCUS, J., Ad Hoc, concurs in the result for reasons assigned by Justice VICTORY.
TRAYLOR, J., concurs in the result for reasons assigned by Justice VICTORY.
VICTORY, J., concurring in the result.
I concur in the majority's holding that Delores Benoit is not personally liable in this case, but not for the reasons stated by the majority. In my view, the maker of a collateral mortgage note is personally liable beyond the value of the mortgaged property when the collateral mortgage note is pledged to secure the debt of a third party.[1] However, in this case, Ms. Benoit, the maker of the collateral mortgage notes, is not personally liable due to mutual error regarding her personal liability.[2]
*383 The majority goes to great lengths, ultimately resorting to "equity," to reach their holding that the maker of a collateral mortgage note is not personally liable beyond the value of the mortgaged property. However, this is not a difficult case. It is a contracts case and this Court need look no further than the language of the contracts, which the majority never once mentions, to determine the rights and obligations of the parties.
First and foremost, both the MC Bank and Diamond Services collateral mortgage notes are personal obligations because they contain unconditional promises to pay $350,000.00 and $300,000 respectively to the bearer. Nothing in these instruments say or imply that there is no personal liability or that Ms. Benoit's liability is limited to the value of the property used to secure the notes. The notes, executed by Ms. Benoit, contain the same language, as follows:
ON DEMAND, I, jointly, severally and solidarily promise to pay to the order of MYSELF the sum of [$350,000 and $300,000, respectively], for value received, with interest thereon at the rate of twelve (12%) per cent per annum from date until paid....
. . . .
The maker(s) of this Note and all endorsers, ..., hereby binding themselves jointly, severally and solidarily, unconditionally and as original promisors, for the payment hereof, in principal, interest, costs and attorney's fees. Furthermore, no discharge or release of any collateral securing this Note or any delay on the part of the holder hereof in exercising any rights hereunder shall operate as a waiver of such rights, or to otherwise diminish or release such collateral.
The written pledge agreement for the MC Bank note signed by Ms. Benoit as "Grantor" specifically gives the creditor the right, if Davenport defaults, to collect payment under Ms. Benoit's collateral mortgage note and apply the proceeds to pay Davenport's debt:
PLEDGEE'S RIGHT TO ACCELERATE PAYMENT UPON DEFAULT:
[If default occurs, Pledgee can accelerate any] Indebtedness secured by the aforesaid Note. Pledgee shall have the additional right, again at its sole option, to declare the aforesaid Note to be immediately due and payable, in principle, interest, costs and attorney's fees.
In addition, the pledge agreement provides:
EFFECT OF WAIVERS.... Grantor has further waived, and/or does by these presents waive, all pleas of division and discussion with regard to the Indebtedness, and agrees that Grantor shall remain liable together with Borrower and any and all guarantors, endorsers and sureties of the Indebtedness on a "joint and several" or "solidary" basis.
The security agreement between Ms. Benoit and Diamond Services likewise gives the latter the right to collect on the collateral mortgage note if Davenport defaults. The agreement describes the "collateral" as Ms. Benoit's collateral mortgage note. It gives Diamond Services the right to collect on any promissory note pledged as collateral, apply the proceeds to Davenport's debt, and return the surplus (if any) to Ms. Benoit:
Default Rights and Remedies: I agree that you may do any or all of the following should I (or borrower) default under any indebtedness secured by this Agreement or should I default under any of my obligations under this Agreement:
Accelerate Indebtedness: Declare all of my (and Borrower's) indebtedness to be immediately due and payable without further notice or demand.
. . . .
Collection of Collateral. Collect any of the Collateral which consists of securities or obligations for the payment of money in the manner provided above and apply any amounts received *384 first to your reasonable expenses of collection and attorney's fees, and then to the payment of my (or Borrower's)indebtedness in such order and priority as you may determine.
So why is it that the majority finds no personal liability in the face of this clear and express language to the contrary? Why, it is because "for well over a hundred years, ... the collateral mortgage and the subsequent pledge of the collateral mortgage note, has customarily not, absent some additional agreement, brought into play the personal liability of the maker...." Op. at 380-81. That's quite a statement, considering that (1) the notes contain unconditional promises to pay; (2) the majority of the noted commentators on the subject, including the professors of security rights at both LSU and Tulane law schools, have expressed their views that the collateral mortgage note imparts personal liability;[3] (3) the majority of Louisiana cases have explicitly[4] or impliedly[5] held that the maker of a collateral mortgage note is personally liable on that note; and, (4) contrary to the majority's conclusion that "[a] collateral mortgage note standing alone is virtually meaningless, as it has no intrinsic value and evidences no debt or obligation actually owed by or to anyone," the collateral mortgage is defined by statute as "a mortgage that is given to secure a written obligation, such as a collateral mortgage note, negotiable or nonnegotiable instrument, or other written evidence of a debt, that is issued, pledged, or otherwise used as security for another obligation." La. R.S. 9:5550(1) (emphasis added).
What "additional agreement" would the majority require in order to impose personal liability on the maker of the collateral mortgage note? The unconditional *385 agreement that "On demand, I, jointly, severally and solidarily promise to pay" is obviously not enough. Maybe the maker of the collateral mortgage note needs to say "I really, really, really promise to pay."
Finally, the majority seems to transform this in personam obligation into an in rem obligation simply because the collateral mortgage notes are secured by mortgages. However, consider the following example by Professor Rubin, which belies this theory:
Nephew goes to Lender to obtain a $100,000 loan. Lender wants security. The only security Nephew has to offer is help from his rich Uncle X. Uncle X refuses to sign Lender's continuing guaranty document but is agreeable to giving a separate negotiable note for $100,000. Uncle X will not co-sign or become an accommodation endorser on Nephew's note. The separate note given by Uncle X to Lender is valid and enforceable, although it does not represent money the lender has advanced or will advance. It is given for value. It has been given for consideration. If Nephew defaults, Lender has two options. First, it could sue Nephew on Nephew's note. Second, it could sue Uncle X on Uncle X's note. Clearly Uncle X has personal liability under his note.
Now, assume Lender asks Uncle X not merely for his own note but for additional security. Uncle X now gives the same $100,000 note, but this time it is paraphed for identification with an act of mortgage on Uncle X's property and the mortgage is properly recorded. The only difference now is Uncle X's note has been paraphed for identification with an act of mortgage. No other change has been made. It is submitted that Uncle X's note is not somehow transformed magically from an in personam obligation to an in rem obligation merely because of the paraph. Uncle X's note is negotiable and remains negotiable. Lender still has several options if Nephew defaults. First, Lender can sue Nephew on Nephew's note. As a second alternative, Lender can sue Uncle X and Uncle X's note. Third, as an additional option, Lender can sue Uncle X to seize and sell the mortgaged property and obtain a privilege on the proceeds of the sale. The proceeds of the sale would then be applied to Uncle X's note. If the proceeds of the sale are insufficient to pay off Uncle X's note (assume, for example, the proceeds of the sale bring only $80,000), then Uncle X's note is extinguished only to the extent of the value obtained at the sheriff's sale ($80,000). Therefore, $20,000 remains extant on Uncle X's note and Uncle X can be sued for the difference, just as Uncle X could be sued for the $100,000 before the paraph was put on the note, or in lieu of pursuing the mortgaged property. It is submitted that cases finding collateral mortgages are in rem by nature misconstrue the collateral mortgage device. Perhaps it is the name "collateral mortgage" that causes the problem. If it were referred to as a "security-interest-in-a-note-secured-by-a-mortgage," maybe the analysis would be easier to see. Nonetheless, its form demonstrates that a collateral mortgage package is primarily one of a security interest in a note, with additional rights against mortgaged property.
Rubin, 55 La.L.Rev. at 634-635.
For all of the above reasons, I believe that the majority erred in holding that the maker of a collateral mortgage note pledged to secure another debt is not personally liable on the collateral mortgage note.
NOTES
[*] Marcus, J., retired, ad hoc, sitting for Lemmon, J., recused.
[1] Diamond Services' mortgage was secondary to MC Bank's.
[2] Diamond Services paid MC Bank $120,092.64. At the time of the assignment, the alleged balance on the MC Bank collateral mortgage note amounted to $307,639.84 in principal, $7,183.93 accrued interest, interest at the rate of 21% from 11/94 until paid, and attorney fees of 25%, subject to a credit of $192,734.00 received in 10/96.
[3] See La.Rev.Stat. 10:3-301 et seq.
[4] The Louisiana Bankers Association, the principal trade association for the commercial banking industry in Louisiana, filed an amicus curiae brief in support of respondent Diamond Services Corporation.
[5] La.Rev.Stat. 9:5550(1).
[6] The pledge of an immovable is called antichresis. La.Civ.Code art. 3135. However, this security device is not used because of its disadvantages to creditors. See Ralph Slovenko, Of Pledge, 33 Tul.L.Rev. 59 (1958).
[7] "Any enforceable obligation (even an oral one) can be secured by a pledge." Michael H. Rubin, David S. Willenzik & Maria A. Moore, Is the Collateral Mortgage Dead?, 41 La. B.J. 529, 530 (1994).
[8] Nathan and Marshall recognized the collateral mortgage device as a "hybrid" and pronounced it "the weird blend of pledge and mortgage." 33 La.L.Rev. at 521 and 498. The device has also been described as "the strange alchemy of the pledge of a mortgage created by the pledgor." 33 La.L.Rev. at 521 (citing Harry Sachse, Report to the Louisiana Law Institute on Article Nine of the Uniform Commercial Code, 41 Tul.L.Rev. 785, 799 (1967)). Nathan and Marshall explained, "As the very name implies, the [collateral mortgage] device contemplates that the mortgage note does not represent an actual debt but will be issued as collateral to secure such debts." 33 La.Rev. at 521.
[9] The personal liability of the maker of the collateral mortgage note is not ordinarily in question when that note is pledged to secure the maker's own debt, represented by a hand note also executed by him, rather than to secure a third party's debt.
[10] These cases did not address the extent of the liability of the maker of a collateral mortgage note pledged to secure the debt of a third party.
[11] As noted in Jason P. Bergeron, Comment, The Third Circuit Trilogy: "Is the Collateral Mortgagor Personally Liable?", 59 La.L.Rev. 921, 923 (1999), the Lowry opinion does not indicate whether proceeds from the sale of the mortgaged property would have been sufficient to satisfy the default judgment. Thus, the Comment suggests, the appellate court may have been premature in speculating on the personal liability of the makers of the collateral mortgage note beyond the value of the mortgaged property. Id.
[12] This court reversed Lowry in part on other grounds. 539 So.2d 46. In concurring, this writer noted (1) that this court had yet to resolve whether the maker of a collateral mortgage note may be held personally liable, as opposed to liable solely to the extent of the value of the mortgaged property, as a result of a third party's default on the hand note and (2) that the relators in their writ application had failed to assign error to the Third Circuit's finding that they were personally liable for the amount of the hand note. 539 So.2d at 47, Calogero, J., concurring.
[13] One commentator has suggested that the majority in Smith reached the correct result, because Rivers had endorsed the dishonored hand note and had, therefore, incurred separate personal liability on the note under La. Rev.Stat. 10:3-415. Bergeron, The Third Circuit Trilogy: "Is the Collateral Mortgagor Personally Liable?", 59 La.L.Rev. at 924.
[14] Judge Hightower partially dissented in Succession of Rogers, relying on Central Bank v. Bishop, 375 So.2d 149 (La.App. 2nd Cir.), writ denied, 378 So.2d 435 (La.1979). In Bishop, the Second Circuit had held that "the collateral note is a separate negotiable instrument which is enforceable by its own terms" and obligates the maker to pay interest from the date stipulated thereon. Judge Hightower reasoned that, if the facially stipulated interest date is to control, as in Bishop, then the face amount of the note must have equal efficacy. 628 So.2d at 38, Hightower, J., dissenting in part.

A few years after Succession of Rogers, the Second Circuit found personal liability on behalf of the maker of a collateral mortgage note who had also executed an additional pledge instrument, which, the court found, confirmed the maker's intent to be solidarily liable for the hand note. Ruston State Bank v. Colvin, 28,490 (La.App. 2 Cir. 6/26/96), 679 So.2d 162, writ denied, 96-1869 (La.10/25/96), 681 So.2d 375. The language of this additional instrument was used to distinguish the case from Succession of Rogers.
[15] Several appellate court cases may have misled commentators to believe that a collateral mortgage note pledged to secure the debt of a third party creates a personal obligation beyond the value of the mortgaged real property. However, none of these cases considered the issue before us today. See Central Bank v. Bishop, 375 So.2d 149 (La.App. 2nd Cir.), writ denied, 378 So.2d 435 (La.1979) (holding a collateral mortgage note bears interest from its date rather than date of pledge); Central Progressive Bank v. Doerner, 365 So.2d 263 (La.App. 1st Cir.1978) (holding a collateral mortgage package secured the creditor to the lesser of (a) principal plus interest on the principal obligation or (b) principal plus interest on the pledged collateral mortgage note); see also, e.g., First State Bank & Trust Co. v. Seven Gables, Inc., 501 So.2d 280 (La.App. 1st Cir.1986), writ denied, 502 So.2d 103 (La.1987) (court holds that the defendant, who had assumed "all of the obligations imposed on" the maker of a hand note, a collateral mortgage, and a collateral mortgage note pledged to secure the hand note, was personally liable, because, under the language of the assumption agreement, the defendant had specifically assumed the maker's obligation evidenced by the hand note; court specifically notes that, absent assumption agreement, defendant would only have been liable in rem up to the value of the property); Louisiana Nat'l Bank v. O'Brien, 439 So.2d 552 (La.App. 1st Cir.), writ denied, 443 So.2d 590 (La.1983) (court finds that the use of phrases like "sole and absolute security," "sole security," and "in rem" throughout both the note and pledge agreement at least creates ambiguity as to the parties' intent about personal liability; however, the thing pledged was an interest in a limited partnership rather than a mortgage on real or immovable property, and court concludes that the maker's liability was limited to the security pledged for his own indebtedness).
[16] We do not here say that there is never personal liability on a promissory note pledged to secure the obligation of another. Instead, we simply conclude that the jurisprudentially-recognized collateral mortgage security device and the collateral mortgage note therein, paraphed ne varietur as it must be for identification with the act of mortgage, do not ordinarily create personal liability on the maker of the collateral mortgage note beyond the value of the mortgaged property when the note is pledged to secure the obligation of a third party. The danger of creating suretyship without it being express and in writing is compounded when the amount of the collateral mortgage note has no rational relationship to the value of the property, but is instead arbitrarily fixed at an amount equal to or even greater than the amount of the hand note or notes to which it is pledged. The instant case is a fitting example, where property appraised at a value of $119,000.00 was twice mortgaged, two collateral mortgage notes were executed totaling $650,000.00, plus interest, and those notes were then pledged to a third party's two hand notes also totaling $650,000.00, plus interest.
[17] The legislature in 1989, when it enacted La.Rev.Stat. 9:5550(1), Acts 1989, No. 137, § 7, effective September 1, 1989, was surely aware that the issue presented in this case was an open question, as the author of this opinion so noted in March of 1989 in his concurrence in the partial writ grant in Concordia Bank & Trust Co. v. Lowry, 539 So.2d at 47. Notwithstanding that observation, the legislature has not chosen to resolve the issue either in Act 137 of 1989 or when it amended La.Rev.Stat. 9:5550(1) in 1991 by Acts 1991, No. 377, § 3, effective January 1, 1992.
[18] MC Bank drew up the pledge agreement for its collateral mortgage package.
[19] It has been argued by respondent and others that the maker of the collateral mortgage note may easily limit her exposure to personal liability by reciting that the mortgage is in rem. Diamond Services' appellate counsel in oral argument indicated that he had drafted many such in rem collateral mortgages. Of course, the response to that argument is that the lender may just as easily obtain full personal liability by having the maker of the collateral mortgage note sign the hand note as a co-maker, sign a continuing guaranty for the hand note, or even endorse the hand note. Our decision today simply holds that the typical collateral mortgage package does not impose personal liability beyond the value of the mortgaged property upon the maker of the collateral mortgage note pledged to secure the obligation of another. Lenders are free, as they have always been, to require that the maker of the collateral mortgage note undertake personal liability for the debt of a third party by the execution of some additional agreement.
[1] Such personal liability is, of course, limited to the lesser of the face amount of the collateral mortgage note and the amount owed in connection with the third party's debt.
[2] The trial court found that the intent and understanding by all parties when Ms. Benoit signed the documents was that she would not be personally responsible for the debts evidenced by the collateral packages. The trial court stated, upon ruling in favor of Benoit on her motion for summary judgment, that "Mrs. Benoit, when she signed the collateral mortgage packages, was informed by Gerald Listi, who was a bank officer of MC Bank at the time, and all others present at the loan closing, that the papers which she was presented with to be signed, that she would not be personally responsible and that only her property would be subject to seizure in the event the amount loaned by the bank was not paid."
[3] Max Nathan, Jr. & Anthony P. Dunbar, The Collateral Mortgage: Logic and Experience, 49 La.L.Rev. 39, 41-42 (1988); Michael H. Rubin, The Work of the Louisiana Appellate Courts for the 1978-1979 TermA Faculty Symposium: Security Devices, 40 La.L.Rev. 572, 582 (1980). Rubin and Stephen P. Strohchein, Developments in the Law 1993-1994: A Faculty Symposium: Security Devices, 55 La.L.Rev. 611, 635, n. 115; Rubin, David S. Willenzik & Maria A. Moore, Is the Collateral Mortgage Obsolete?, 41 La. B.J. 529, 530 (April 1994).
[4] See Merchants & Farmers Bank & Trust v. Smith, 559 So.2d 845 (La.App. 3 Cir.), writ denied, 563 So.2d 865 (La.1990); Concordia Bank & Trust Co. v. Lowry, 533 So.2d 170 (La.App. 3 Cir.1988), rev'd in part on other grounds, 539 So.2d 46 (La.1989); Bank of Lafayette v. Bailey, 531 So.2d 294 (La.App. 3 Cir.), writ granted in part, 533 So.2d 5 (La. 1988); Central Bank v. Bishop, 375 So.2d 149 (La.App. 2 Cir.), writ denied, 378 So.2d 435 (La.1979) (holding that the collateral mortgage notes creates a personal obligation for which the maker is liable); but see Commercial Nat'l Bank v. Succession of Rogers, 628 So.2d 33 (La.App. 2 Cir.1993); Bank of New Orleans & Trust Co. v. HPB, Jr. Development Co., 427 So.2d 486 (La.App. 5 Cir.1983) (holding that the maker of a collateral mortgage note is not personally liable on such a note when it is used to secure the debt of a third party).
[5] Kaplan v. University Lake Corp., 381 So.2d 385 (La.1979) (holding that a collateral mortgage note can prescribe); First State Bank & Trust Co. v. Seven Gables, Inc., 501 So.2d 280 (La.App. 1 Cir.1986), writ denied, 502 So.2d 103 (La.1987) (holding that the defendant, who had assumed "all of the obligations" under a collateral mortgage note and collateral mortgage, was personally liable); Louisiana Nat'l Bank v. O'Brien, 439 So.2d 552 (La.App. 1 Cir.), writ denied, 443 So.2d 590 (La.1983) (holding that the use of phrases like "sole and absolute security," "sole security," and "in rem" throughout both the note and pledge agreement at least create ambiguity as to the parties' intent about personal liability); Central Bank v. Bishop, supra (holding a collateral mortgage note bears interest from its date); Central Progressive Bank v. Doerner, 365 So.2d 263 (La.App. 1 Cir.1978) (holding a collateral mortgage package secured the creditor to the lessor of (a) principal plus interest on the principal obligation or (b) principal plus interest on the pledged note; the parties can by agreement and with specific language create an in rem note, but this requires specific language). These holding confirm that a collateral mortgage note has the same legal effects as any other promissory note and is thus a written obligation enforceable according to its terms.