Levy. Jr. vs. Ford et al.

## No. 260.

### SIMON LEVY, JR., VS. S. N. FORD, ET AL.

| | |
|---|---|
| 41 | 873 |
| 44 | 244 |
| 41 | 873 |
| 46 | 50 |
| 46 | 1068 |
| 41 | 873 |
| 47 | 805 |
| 47 | 809 |
| 41 | 873 |
| 48 | 1228 |
| 49 | 1021 |
| 41 | 873 |
| 51 | 1267 |
| 41 | 873 |
| 105 | 478 |
| 105 | 580 |
| 41 | 873 |
| 114 | 893 |

1. A promissory note secured by an act of mortgage, executed and issued only for use as collateral security for a presently existing debt, payable at a future date, to the maker's own order, and by him endorsed, passes, before maturity, free of all equities and offsets in the maker's favor.

2. In case the indebtedness of the maker, which said collateral was intended to secure, has been paid, and the collateral returned to the maker, he may again reissue same to any other creditor of his, either before or after maturity and under like conditions as he might transfer or pledge a note primarily executed for value.

3. The pre-existent debt must be extinguished, otherwise there is no novation; if it be only modified in some parts, and any stipulation of the original obligation be suffered to remain, it is no novation. It is not presumed, and the intention to make it must clearly result from the terms of the agreement, or by a full discharge of the original debt.

A PPEAL from the First District Court, Parish of Caddo.
  *Taylor,* J.

---

*Land & Land* for Plaintiff and Appellee:

1. The Bourquin rent notes having been extinguished by a double novation, the mortgage securing same was not transferred to the substituted credits, in the absence of an express reservation.   C. C. 2189, 2195.

2. The mortgage note was surrendered to the maker for the purpose of securing the Bourquin rent notes—and could not be pledged for other debts without the consent of the former holder.

3. Said mortgage note was extinguished by payment and confusion, and could not be reissued by the maker before or after maturity so as to revive the mortgage.   4 R. 416; 19 Ann. 260; 23 Ann. 639; 25 Ann. 438.

4.  The cases in 35. Ann., 5 and 39 Ann. 712 have no application to the case at bar.  In neither case was there proof of payment or confusion.  And in both cases the doctrine is limited to the reissue of mortgage notes, given originally to nominal mortgagees, and acquired by third innocent persons before maturity.  In the case at bar the note was obtained from the maker after it had been negotiated, and had "come back" into his hands, and again coming into his hands after maturity, it was reissued after third persons had acquired mortgage rights.

5.  A mortgage cannot be created by the issue or reissue of a note.  When a dormant mortgage once arises, it is like an ordinary conventional mortgage, and is extinguished whenever the mortgagor reacquires the evidence of the principal obligation.  A man cannot hold as owner an obligation against himself.

6.  The omission of a clerk to write down a part of the alleged testimony of a witness, is no ground for a new trial.  3 R. 364; 32 Ann. 1078.  Such omissions must be supplied before the submission of the case.  33 Ann. 932, 1079; 29 Ann. 716.

*Wise & Herndon* and *Alexander & Blanchard* for Defendants and Appellants:

Suit by junior mortgagee for erasure of anterior mortgage.  Alleged ground: Payment of note and extinguishment of mortgage.

Decision favorable to plaintiff on ground not alleged in petition; novation of notes for which the mortgage note in controversy was deposited as collateral security.

A and B are obligors of an obligation contracted to C.  To secure this debt B deposits as collateral security his note secured by mortgage on property owned by him.  Afterwards C releases A and substitutes D in his place.  To this B. consents and agrees that the mortgage collateral shall continue responsible for the debt.  Query: By this arrangement, what is novated?  Is it the whole of the original obligation to C, or only A's part of the obligation?  Clearly the latter.  Pre-existent obligation not extinguished.  What was done amounted only to modification of original obligation, and not its novation.  C. C. 2187.

The judge *a quo* fails to make this distinction, and holds that original obligation is novated.

Applicability of C. C. 2195, on which lower judge relies, denied.  Law governing this case is C. C. 2187.

But even if C. C. 2195 be applicable, case is with defendants, for there was express reservation by the creditor of the mortgage collateral.

Maturity of a note does not affect right to pledge it as collateral security; nor does the surrender of a note to the maker, by party who has held it as collateral to another note which is paid, extinguish the collateral note.  Maker has legal right to reissue it.  25 Ann. 363; 35 Ann. 5; 39 Ann. 729, 730.

The opinion of the Court was delivered by

WATKINS, J.  The plaintiff, as holder of a junior mortgage on the property of the defendant S. N. Ford, has brought this action for the cancellation of the inscription of a senior and interfering mortgage, held by the defendant William Winter, on the ground that the mortgage indebtedness had been paid and satisfied, and the note returned to the maker; and on the further ground that, if said Ford had reissued said note, it was reissued, after maturity, to Winter, without a valuable consideration, and that he was not a *bona fide* holder thereof.

J. G. McWilliams was cited as one of the defendants, but the record discloses that he has no interest in the transaction. The principal defendants are S. N. Ford and William Winter, and their contention is that Winter holds the said senior mortgage as collateral security for the payment of certain rent notes due by Mrs. Bourquin to S. N. Ford, and by him endorsed, certain other indebtedness from the Fords to Winter then existing, and all future indebtedness that might be contracted by them—Winter agreeing to deliver same to A. Cohn as owner, as soon as all indebtedness to him was satisfied. Winter claims to have advanced, under this agreement, $1290 00, and for this sum, and the balance due on rent, he asserts his right to hold and retain the mortgage note as collateral security.

The judge *a quo* sustained the demands of the plaintiff in part, to the extent of holding that the obligation of S. N. Ford had been novated, by reason of the cancellation of the Bourquin rent notes, in January, 1889, and the acceptance of other notes of Martin & Burns, as lessees, and others of Ford, in their stead; and he ordered the mortgage cancelled to the extent of $5808 06, thus leaving it in operation and effect as to the remainder of the Ford's indebteness to Winter.

Of this judgment both parties complain.

The salient facts are these :

On the 10th of June, 1886, S. N. Ford executed a promissory note for $7000, due at twelve months, payable to his own order, and endorsed and delivered same to McWilliams, McCutcheon & Demming, private bankers, as collateral security for his account which was then owerdrawn to the extent of $10,000.

Subsequently this bank became merged into the Commercial National Bank, and he continued business with it as he had done with its predecessors. Their dealings were continued until the 24th of February, 1887, when Ford settled his indebtedness, and the bank surrendered the collateral.

On the 26th of February, 1887, Ford executed his note to his own order, for $3,610 20, and endorsed and delivered it to Adolph Cohn for a debt he owed him, and also delivered to him, as collateral security therefor, the $7000 mortgage note which had just been surrendered to him.

In April, 1887, S. N. Ford leased his warehouse to Mrs. M. L. Bourquin, at a rent of $141 66⅔ per month, for a term of five years, and for which sums she executed her notes.

During the following September, Ford, having found himself in a situation which required additional funds, he sought to discount the

Bourquin rent notes to Wm. Winter. He expressed himself as being willing to discount the paper, but required additional security. Ford then applied to Adolph Cohn for the $7000 mortgage note, to place it with Winter, and he gave his consent, provided he was fully protected. He surrendered the note to Ford on the 16th of September, 1887, and he executed a receipt to Cohn which concludes thus : "The said Winter binds himself to protect Cohn to the amount of the said note of $3610 20."

On the same date Winter executed to Ford a receipt for the $7000 note, as a collateral security for the payment of the Bourquin rent notes, an acceptance of S. N. Ford for $300, and for any other sum of money he might loan W. P. Ford on notes, or acceptances thereafter; and therein stipulated for its surrender to " Adolph Cohn, the present owner," when the rent notes shall have been paid and also all the indebtedness of the Fords.

It must be borne in mind that this transaction occurred subsequent to the maturity of the $7000 note; but that the one with A. Cohn took place before it went to maturity.

In the meanwhile S. N. Ford had continued his account with the Commercial National Bank; and on the 29th of June, 1887 — prior to the transaction with Winter — he executed and delivered to the bank a $10,000 mortgage note. He also executed on the 5th of January, 1888— subsequent to the Winter transaction — a $5000 mortgage note, and delivered it to the bank; both of these notes being collaterals for his account.

Becoming solicitous in reference to Ford's account, the officers of the bank requested him to make arrangements to close it up and he transferred his business to the plaintiff's bank, and on the 7th of March, 1888, he executed in plaintiff's favor two notes of $10,000 each, and secured them by special mortgage on his warehouse and various other properties in the City of Shreveport.

On the same date the sum of $11,500 was paid on Ford's checks, to the Commercial National Bank, and the $10,000 and $5000 mortgage notes were surrendered and the mortgages canceled, by direction of the plaintiff. Some additional advances were made to Ford, with a resultigg balance of $18,720 07 against him, for which suit was filed on March 19, 1889, demanding the foreclosure of plaintiff's mortgage.

On the same date the present suit was filed in aid of the former one.

The proof does not disclose that there was any subrogation of the two foregoing mortgages, to the plaintiff, either legal or conventional. The very object Ford had in view, in consenting the $20,000 mortgage, was

to raise funds to pay off the other two, and that was the first thing he did after he had opened an account with the plaintiff; and immediately afterwards they were canceled and erased from the mortgage records.

In January, 1889, the lease of Mrs. Bourquin was canceled by the mutual consent of the parties, and her remaining rent notes were surrendered to her. At the *same time*, a new lease was made of the warehouse to Martin & Burns for the unexpired term of the lease, at $100 per month, and Ford gave his personal notes for the difference of $41 60 per month, the latter being that much less than the former.

These notes were given to Winter in lieu of the Bourquin notes, and he continued to hold in possession, as collateral security, the $7000 note.

Quite a number of witnesses were introduced for the parties on either side, who detailed the particulars of these dealings and transactions without throwing much additional light on the crucial questions in the case. There are three:

1. Whether S. N. Ford had the legal right to re-issue the mortgage note *before maturity*, or *after maturity*.

2. Whether Winter obtained a valid title to the note as collateral security.

3. Whether the transaction in reference to the Bourquin rent notes had the effect to novate *the debt secured by the pledge of the note as collateral* security, and thus extinguish it.

## I.

The note in controversy was executed and issued *only* as a collateral security. At the date of its issuance and execution, S. N. Ford did not owe McWilliams, personally, a single dollar; and when the note and mortgage were handed to him he obtained from him no value in exchange. When he received them, McWilliams placed them with his bank as collateral security for Ford's account. When same was subsequently settled and paid, this collatteral paper was surrendered. It was then not due. When it again reached the hands of Ford same possessed no *intrinsic* value.

This court has frequently recognized the validity of such dealings, and the legality of the issuance of such paper, and its use in the course of commercial dealings. Morris vs. Cain, 39 Ann. 730; Bank vs. Cason, 39 Ann. 866; Mix vs. Creditors, 39 Ann. 730; Lanatta vs. Bayhi, 31 Ann. 229; Sadler vs. White, 14 Ann. 177; Chaffe & Sons vs. Whitefield, 40 Ann. 631; Lehman, Abraham & Co. vs. Godbury, 40 Ann. 219; Gibert vs. Seiss, 40 Ann. 667. See also, to the same purport, Daniel on

Negotiable Instruments, Sections 827 and 830, which quotes with approval Prior vs. Shaw, 20 Eng. Law and Eq. 103 ; Blanchard vs. Stephens, 3 Cush. 168, and Manning vs. McLeur, 36 Ill. 498, which maintain the doctrine that the holder of collateral, or accommodation paper obtained before maturity, is deemed a holder for a valuable consideration, in the ordinary course of trade, and free from latent defenses on the part of the maker. And in Morris vs. Cain, 39 Ann. 712, we held that when notes executed and used as collateral security, were returned upon the payment of the debt secured, to the maker, it was legal and competent for him to re-issue them as collateral security for *other* indebtedness, before their maturity. Schepp vs. Smith, 39 Ann. 5.

But plaintiff's counsel strenuously resist the idea of such collateral paper, secured as it is by a *dormant* mortgage in favor of a *nominal* payee, while it is in the *possession of the maker*, being by him re-issued after the apparent maturity of the note. But it is difficult to perceive the basis on which this pretension rests, as, under the authorities cited *supra*, collateral paper, like accommodation notes, is controled by precisely the same rules, as paper which is *primarily* issued for value — once the collateral paper has been issued and placed as security.

Of this opinion was the district judge, and hence he maintained the legality of Ford's re-issuance of the $7000 note, after its maturity— if such were the case. There is practically no difference of opinion with regard to the validity of this note, as collateral security in the hands of A. Cohn, as he received it from Ford on account of an unquestioned indebtedness, before the date of its maturity.

There is a fact of importance, which should be considered just here; and it is, the transaction between Cohn and Ford, and Ford and Winter, which took place shortly *after* the maturity of the collateral.

From the evidence it appears that W. P. Ford was the mutual agent, and mandatary of all the parties, in its confection and completion, and it was a perfect understanding with Cohn that he was "to be protected." *His* receipt so states. Hence Winter, in obtainining the note from Cohn as pledgee of Ford, acquired a *limited* interest in it, which we need not define, and cannot, because Cohn is not a party to this suit, and cannot be bound by our decree in this case; and because it will subserve our present purpose to ascertain the time, source and circumstances of Winter's acquisition of the paper as collateral security. He acquired it from Cohn, and in his receipt obliged himself to return it to Cohn *when :* 1. The Bourquin notes were paid; 2. The W. P. Ford acceptance was satisfied; 3. And all other indebtedness of the Fords was settled. To this pledge, S. N. Ford, the maker, consented.

Mr. Daniel says that although a note is transferable after maturity "in like manner and form as before, yet the fact of its dishonor, which is apparent from its face, is equivalent to notice to the holder that he takes it subject to its infirmities, and can acquire no better title than his transferor had. * *. But there is this limitation to this doctrine, that if the holder acquired the paper after maturity, from one who became a *bona fide* holder for value, and without notice, before maturity, he is then protected by the strength of his vendor's title." 1 Dan. Neg. Ins., Sec. 782.

The same learned author says " the general rule, that the purchaser of overdue paper can stand in no better position than his transferor, does not apply, so far as to invalidate bills and notes drawn, indorsed or accepted for accommodation, overdue at the time they are negotiated, or transfered, it being considered that parties to accommodation paper hold themselves out to the public, by their signatures, to be bound to every person who shall take the same for value, the same as if it were paid to themselves. And the fact that the purchaser knew that the paper was so drawn, indorsed or accepted for accommodation does not weaken his position." Ibid, Secs. 726, 786.

He says further: "It is to be observed that, as a general rule, the purchaser can never be placed on a worse footing than his transferor, although he himself could not, in the first instance, have acquired the vantage ground occupied by such transferor. And therefore, even if he have notice that there was fraud in the inception of the paper, or that it was lost, or stolen, or that the consideration had failed between some antecedent parties, or the paper be overdue and dishonored, he is, nevertheless, entitled to recover, provided his immediate vendor was a *bona fide* holder for value, unaffected by any of these defenses. As soon as the paper comes into the hands of a holder, unaffected by any defect, its character as a negotiable security is established; and the power of transferring it to others, with the same immunity which attaches in his own hands, is incident to his legal right, and necessary to sustain the character and value of the instrument as property, and to protect the *bona fide* holder in its enjoyment." Ibid. Sec. 803. These principles are sanctioned and well grounded in authority. Howell vs. Crane, 12 Ann. 126; Cotton vs. Sterling, 20 Ann. 282; Cook vs. Larkin, 19 Ann. 507; Commissioners vs. Clark, 94 U. S. 285; Cromwell vs. County of Sal., 96 U. S. 51; Hoffman vs. Bank, 12 Wall 181; Henerth vs. Bank, 34 Ind. 380; Momeyer vs. Cooper, 35 Iowa 257; Haskill vs. Whitman, 19 Mo. 102; Hogan vs. Moon, 48 Ga. 156; Woodworth vs. Hunter, 40 Ill. 131; Bas-

sett vs. Avery, 15 Ohio St. 299; Boyd vs. McCain, 10 Mo. 118; Watson vs. Flanagan, 14 Tex. 354; Robinson vs. Reynolds, 22 B. 196.

Many of the foregoing authorities are cited by Daniels, and they fully support the fundamental principles he has announced. While they do not in terms embrace collateral paper, it comes clearly within the scope and meaning of them, and, therefore, it is equally clear that it may be reissued after maturity as other paper; and when once reissued as security by a *bona fide* creditor, before maturity, it may be by him passed, or assigned to another, after its maturity, and such other person will be protected by the good faith of his transferor.

Under the circumstances of this case this is, in our opinion, the position occupied by Winter.

## II.

The argument of the second proposition became, unavoidably, blended with the first. As intimated in the first portion of our opinion, we regard it as a well established fact that the plaintiff did not acquire any rights of lien or security by virtue of his payment of the $10,000 and $5000 mortgage notes of Ford; and it is equally clear that, whatever may have been Ford's statement to plaintiff relative to the details of his indebtedness, it was in the power of plaintiff to have protected himself by having procured a certificate of mortgages. This he did not do. The title of Winter is therefore clear.

## III.

The articles of the Civil Code defining novation are few and simple.

Article 2187 provides that "the pre-existent obligation must be extinguished, otherwise there is no novation; if it be only modified in some parts, and any stipulation of the original obligation be suffered to remain, it is no novation."

Article 2190 declares that "novation is not presumed; the intention to make it must clearly result from the terms of the agreement, or by a full discharge of the original debt."

In this case there was no plea of novation, but, as we are informed by the opinion of the learned district judge, and the brief of defendant's counsel, the novation relied upon as having extinguished the obligation which was secured by the mortgage collateral, is that of the substitution of a new debtor in the lease contract with Ford.

On this question the evidence is that Winter contracted with Ford to purchase, or discount the Bourquin rent notes, on Ford furnishing the $7000 mortgage collateral, through the dealings detailed with Cohn; and, at the *same time*, and as an integral part of the same transaction,

Winter contracted to pay W. P. Ford's draft on him, in favor of S. N. Ford, for $300, and, in the future, to furnish the Fords additional means on notes and acceptances. The proof shows that $1290 additional money was furnished by Winter. He held this collateral paper for the *whole* of this indebtedness from the commencement. That was a perfectly legitimate transaction, and it was but one, indivisible obligation and agreement. Whether it was binding and conclusive on Cohn we cannot say, as he is not a party, now.

By the elimination of the Bourquin notes from the contract, the contract between Ford and Winter was not novated, for two reasons: First, because "the pre-existent obligation" of Ford to Winter was not extinguished, but only modified. R. C. C. 2187; second, because the intention to novate that obligation does not " clearly result from the terms of the agreement." R. C. C. 2190.

On the contrary we are of the opinion that their intention on this subject was just to the reverse.

Nor can it be correctly argued that such was the legal effect of their convention, in respect to the plaintiff as a mortgage creditor of Ford and a third person. True it is, that article 2195 of the Civil Code declares that "the privileges and the mortgages of the former credit are not transferred to that which is substituted to it, unless the creditor has expressly reserved them." The privileges and mortgages indicated are rather those primarily securing obligations than such as secure collateral paper. This is evidenced by the language of the following article, which says that " when novation takes place by the substitution of a new debtor, the original privileges and mortgages of the credit cannot be transferred on the property of the new debtor."

Who is the new debtor in this case? Of course the new lessees are. Then it is clear that it is the mortgage, or lien of the *original credit* that was in the mind of the Legislature when it enacted the law. As we view this transaction it was the contract of indorsement by Ford and his other obligations that the collateral was intended to secure, and that it was never novated or extinguished, nor the *amount* of his obligation reduced.

Entertaining these views we feel bound to amend the judgment appealed from, by rejecting the demands of plaintiff *in toto*. It is, therefore, ordered and decreed that the judgment appealed from be so amended as to reject and dissallow the demand of the plaintiff *in toto*, and as, thus amended the same be affirmed, and that the plaintiff and appellee be taxed with the cost of both courts.

Mr. Justice McEnery dissents from the opinion of the court and reserves the right to file a dissenting opinion.