# STATE OF LOUISIANA
# COURT OF APPEAL, THIRD CIRCUIT

## CA 12-138


**EDWARD D. GUTIERREZ**

**VERSUS**

**DAVID M. BALDRIDGE, ET AL.**

### Consolidated with CA 12-139

**A & A CONSTRUCTION, LLC**

**VERSUS**

**EDWARD DONOVAN GUTIERREZ**


\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. C-20091819 C/W C-20092962
HONORABLE MARILYN CARR CASTLE, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

## JIMMIE C. PETERS
## JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Oswald A. Decuir, Jimmie C. Peters, and Billy Howard Ezell, Judges.


**AFFIRMED.**

**Burnice Gerald Weeks**
**The Weeks Law Firm**
**1150 Expressway, Ste 205**
**Pineville, LA 71360**
**(318) 442-3045**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
    Edward D. Gutierrez

**Cade Aaron Evans**
**Allen & Gooch, APLC**
**2000 Kaliste Saloom Road, #400**
**Lafayette, LA 70508**
**(337) 291-1240**
**COUNSEL FOR DEFENDANTS/APPELLANTS:**
**David M. Baldridge**
**A & A Construction, LLC**

**PETERS, J.**

In these consolidated cases, David M. Baldridge appeals the trial court's rejection of his claim against Edward D. Gutierrez for recovery of certain financial obligations associated with a partnership agreement entered into between the two individuals; A & A Construction, LLC appeals the trial court's rejection of its monetary claim against Edward D. Gutierrez based on a real estate mortgage. For the following reasons, we affirm the trial court judgment.

## DISCUSSION OF THE RECORD

### *Procedural History*

On March 26, 2009, Edward D. Gutierrez brought a suit for damages against David M. Baldridge and his wife, Alexis R. Baldridge. In his suit, Mr. Gutierrez claimed that he and Mr. Baldridge entered into a partnership agreement on July 17, 2007, wherein they agreed to conduct business under the name of A & A Construction, LLC (A & A), a preexisting business entity wholly owned by David and Alexis Baldridge. Mr. Gutierrez asserted in his petition that through his connections and expertise, he obtained a number of contracts for the partnership which resulted in gross receipts to A & A of $5,000,000.00 and estimated profits in excess of $1,400,000.00. According to Mr. Gutierrez's pleadings, he discovered during the partnership dissolution process that Mr. Baldridge had diverted the profits into numerous other businesses he personally owned. These included entities known as Safe House Technologies, LLC; A & A Pest Control of LA, LLC; and David M. Baldridge, Inc. Mr. Gutierrez claimed $700,000.00 as his share of the net profit of the partnership, and sought judgment against Mr. and Mrs. Baldridge for that amount.

Mr. and Mrs. Baldridge answered the petition on May 6, 2009, by acknowledging the existence of the partnership as well as the legal entities identified in the petition, but denying that the partnership participated in any lucrative contracts or years of steady work. In addition to raising a number of affirmative defenses, Mr.

1

and Mrs. Baldridge asserted that the partnership relationship ceased due to Mr. Gutierrez's failure to perform his partnership obligations and that any amounts owed to Mr. Gutierrez were offset by his financial obligations to them.

A reconventional demand, filed by Mr. Baldridge alone, accompanied the answer to Mr. Gutierrez's petition. In his reconventional demand, Mr. Baldridge asserted that the partnership agreement became null and void under its terms on April 30, 2008, when Mr. Gutierrez ceased communicating with him or any representative of A & A and ceased providing services to A & A. He further asserted that on August 13, 2008, Mr. Baldridge sent Mr. Gutierrez a letter demanding payment of two separate debts:

> (1) $62,324.80, being Mr. Gutierrez's share of outstanding debts owed by the partnership to A & A.

> (2) $190,000.00 owed by Mr. Gutierrez to A & A, being a loan from A & A to Mr. Gutierrez for the purchase of his personal residence at 102 Saddlewood in Lafayette, Louisiana.

In his reconventional demand, Mr. Baldridge sought a personal judgment for the amount associated with the partnership, but not with the real estate loan. In his answer to the reconventional demand filed on May 20, 2009, Mr. Gutierrez acknowledged that he received the demand letter, but denied the remainder of the allegations.

On May 15, 2009, or nine days after the filing of the answer and reconventional demand to Mr. Gutierrez's petition, A & A filed a separate suit against Mr. Gutierrez captioned as a "**PETITION FOR FORECLOSURE BY ORDINARY PROCESS**." In that petition, A & A asserted that it was the holder and owner of a promissory note in the original principal sum of $180,000.00 which had been executed by Mr. Gutierrez on May 19, 2008; that the promissory note was made payable on demand to the order of the bearer of the note; that it bore interest at the rate of seven percent per annum; and that it had been "paraphed Ne Varietur for identification with and secured

2

by a Collateral Mortgage" executed the same date and affecting immovable property situated in Lafayette Parish, Louisiana.[1] A & A attached copies of the mortgage and note to its petition, and in its prayer for relief, sought a judgment against Mr. Gutierrez for the amount due on the promissory note, including interest and attorney fees, and for recognition of the mortgage against the immovable property.

In his April 12, 2010, general denial answer to this petition, Gutierrez admitted that he had executed the collateral mortgage and note, but asserted that the indebtedness represented by the promissory note had been cancelled pursuant to a written act of release of the mortgage dated May 19, 2006, the same day as its execution.

On April 19, 2010, Mr. and Mrs. Baldridge filed a motion to set their matter for trial. On April 26, 2010, the trial court set the matter for trial on September 13, 2010. However, when the motion was filed, there was a pending motion filed by Mr. and Mrs. Baldridge seeking consolidation of both actions. On the same day the trial court set a trial date, it also granted the motion to consolidate. The trial court executed a judgment granting the consolidation of the actions on April 30, 2010.

Some of the issues raised in the pleadings were resolved after an August 30, 2010, hearing wherein the trial court dismissed all of Mr. Gutierrez's claims against Mr. and Mrs. Baldridge. This judgment which was executed by the trial court on September 3, 2010, is not before us in this appeal.[2] Thus, when the matter went to trial on September 13, 2010, the only claims before the trial court were Mr. Baldridge's claim against Mr. Gutierrez for reimbursement under the partnership

---

[1] The petition provides the legal description of the mortgaged property as Lot 7 of Points of View Subdivision in Lafayette Parish, Louisiana. There seems to be no dispute but this legal description is that of a piece of property bearing a municipal address of 102 Saddlewood in Lafayette Parish.

[2] The merits of this judgment were considered on appeal by this court in a prior opinion, and those issues are not now before us. *See Gutierrez v. Baldridge*, 10-1528, 10-1529 (La.App. 3 Cir. 5/11/11), 65 So.3d 251, *writ denied*, 11-1589 (La. 10/7/11), 71 So.3d 319.

agreement and A & A's claim against Mr. Gutierrez associated with the real estate transaction.

Mr. Gutierrez did not appear at the September 13, 2010, trial, but after hearing all of the evidence presented by Mr. Baldridge and A & A, the trial court rejected their demands. The trial court executed a judgment dismissing their claims on May 13, 2011, and denied their subsequent motions for new trial by a written judgment dated November 7, 2011. Thereafter, Mr. Baldridge and A & A timely perfected this appeal.

### *Evidence Presented at Trial*

Mr. Gutierrez sought and was denied a continuance of the September 13, 2010, trial. Without any appearance by him or his counsel, the matter went to trial and was decided based solely on the evidence presented by Mr. Baldridge and A & A. In addition to the testimony of Mr. Baldridge and Rebecca K. Miller, Mr. Baldridge's administrative assistant at A & A, Mr. Baldridge and A & A offered the following exhibits as evidence at trial:

1. A copy of the collateral mortgage note dated May 19, 2006.

2. A certified copy of the collateral mortgage paraphed for identification with the collateral mortgage note.

3. A copy of the August 13, 2008, demand letter together with the attached certified mail receipt reflecting delivery to Mr. Gutierrez on August 14, 2008, and a single page attachment purporting to be a summary of assets and liabilities of the partnership as of April 30, 2008.

4. A copy of the partnership agreement dated July 17, 2007, as well as one addendum to the agreement dated the same day.

5. A copy of a September 30, 2009, letter from the Lafayette Parish Sheriff's Department notifying A & A, as mortgage holder, that the immovable property securing its mortgage had been sold at tax sale on May 6, 2009, and was subject to redemption through May 19, 2012.

6. A certified copy of a tax redemption deed dated and recorded October 23, 2009, reflecting that the immovable property subject to the collateral mortgage had been redeemed by the payment of $1,977.55.

7. A four-page document entitled "SUMMARY OF ASSETS AND LIABILITIES" and purporting to be a summary for A & A as of April 30, 2008. The document suggests a net worth of a negative $137,209.70.

8.  A six-page document entitled "SUMMARY OF PARTNERSHIP DEBT AS OF 4/30/08" and purporting to be a summary of the partnership financial activity giving rise to a total partnership debt of $184,678.81.

9.  A copy of a cancelled check dated May 11, 2006, drawn on the A & A Construction account for $190,000.00, and made payable to Mark B. Tompkins, Attorney.

10.  An A & A bank statement covering the period between April 22 and May 19, 2006, and reflecting that the $190,000.00 check was cashed on May 12, 2006.

Mr. Baldridge testified that he met Mr. Gutierrez in 2003, authorized A & A to loan Mr. Gutierrez the funds necessary to purchase his home in May of 2006, and personally entered into the partnership agreement on July 17, 2007.  Nothing was ever paid to A & A for the home loan, and the partnership lasted less than one year.

With regard to A & A's claim, Mr. Baldridge testified that he was present on May 19, 2006, when Mr. Gutierrez executed both the collateral mortgage note and the collateral mortgage, but that he never acquired possession of the note itself on behalf of A & A.  He further testified that while his efforts to find the original note in the records of the attorney who handled the transaction proved unsuccessful,[3] he had no evidence to suggest that the note had been given to anyone else.  As further proof of the transaction, he offered as evidence a copy of the collateral mortgage note, a certified copy of the collateral mortgage, and a copy of a $190,000.00 check dated May 11, 2006, made payable to Mark Tompkins, Attorney.  The trial court allowed the latter two exhibits to be introduced, but rejected his evidentiary offering of the copy of the May 19, 2006, collateral mortgage note in lieu of the original, and refused to allow the record to remain open for the introduction of further evidentiary filings to cure the court's objection to the offering.  The trial court allowed A & A to introduce evidence that, on at least one occasion, it had redeemed the property after a tax sale when Mr. Gutierrez failed to pay the annual property taxes.

_____
[3] The attorney died before trial began.

5

Ms. Miller testified that she began working for A & A and Mr. Baldridge in the latter part of 2006 and only became aware of the real estate transaction when she began recreating the 2006 records in January of 2007. In that process, she came across the $190,000.00 check made payable to Mr. Tompkins and when she questioned Mr. Baldridge concerning the purpose of the payment, he replied that it was a real estate loan to Mr. Gutierrez. She flagged the transaction for consideration by the company's accountant because she had no category in her bookkeeping records to enter the payment.

With regard to the partnership settlement claim, Mr. Baldridge testified that when he sent the August 13, 2008, demand letter, the amount due from Mr. Gutierrez was $62,324.80 as evidenced by the attachments to the letter. He acknowledged being a party to both the July 17, 2007, written partnership agreement and addendum introduced into evidence, and asserted that these documents contained the intended terms of the relationship created. However, he testified that Mr. Gutierrez failed to provide any significant services to the partnership although "[h]e did round up two or three little jobs." According to Mr. Baldridge, in March of 2008 Mr. Gutierrez simply stopped coming to work. He testified that his attempts to contact Mr. Gutierrez by telephone were unsuccessful, but that ultimately Ms. Miller made contact.

Ms. Miller testified that it was the last day of April of 2008, not March of 2008 as testified to by Mr. Baldridge, when Mr. Gutierrez ceased coming to work. Several days later she contacted him and he informed her that he had quit "because there was no money to be made."

Ms. Miller assisted Mr. Baldridge in compiling the financial documents attached to the August 13, 2008, demand letter. However, the exhibits and her testimony revealed internal contradictions concerning the calculation of the amount owed to A & A as of April 30, 2008. The August 13, 2008, demand letter suggested that Mr. Gutierrez's share of liability was $62,324.80 based on some minor

adjustments made to the four-page exhibit introduced in evidence which purports to show A & A's net worth on April 30, 2008, as -$137,209.70. In direct conflict with this calculation is the six-page exhibit also introduced in evidence which purports to show that the total partnership debt as of April 30, 2008, was $184,678.81. Ms. Miller acknowledged that the six-page document had not been attached to the demand letter, but testified that the actual amount owed by Mr. Gutierrez was one half of the larger amount, or $92,339.39. This adjustment was based on a reevaluation of some of the debt categories. In response to questions by the trial court, she further acknowledged that if one considered the amount set forth in the demand letter to be the more accurate figure, it still should be reduced by $2,500.00. Further questioning by the trial court caused Ms. Miller to acknowledge that other categories needed adjusting and, if adjusted, would generate an increase of $2,881.00 in the amount owed by Mr. Gutierrez.

Ms. Miller also confirmed that in the latter part of 2008 a number of limited liability companies owned solely by Mr. Baldridge were consolidated into one corporation: David Baldridge, Incorporated. These included A & A, as well as A & A Insulation, LLC; Real Construction, LLC; Safehouse, LLC; and A & A Pest Control, LLC. Ms. Miller testified that, while technically the umbrella corporation assumed all the assets and liabilities of the limited liability companies, only A & A had any debts.

In reaching its decision to reject Mr. Baldridge's request for reimbursement, the trial court did not consider the discrepancies in the accounting documents. Instead, based on its interpretation of the partnership language, the trial court concluded that an accounting was not yet available because A & A continued to do business, although in another name. The trial court concluded that the partnership agreement did not provide an accounting remedy until A & A ceased to do business. Additionally, the trial court noted that the partnership agreement provided that in the event that either party ceased to perform his obligations within the partnership, the

7

partnership was to be considered null and void. Based on the inability of A & A to produce an original promissory note and its further failure to show compliance with the requirements of La.R.S. 13:3741, the trial court also rejected its claim for judgment against Mr. Gutierrez.

## *Assignments of Error*

In their appeals, Mr. Baldridge and A & A jointly raise five assignments of error:

1. The trial court erred when it failed to consider A&A's breach of contract theory and only considered the claim for enforcement of the note.

2. The trial court erred when it found that A&A failed to properly establish the existence of the indebtedness owed to it by Gutierrez.

3. The trial court erred when it failed to accept into evidence a copy of the Collateral Mortgage Note.

4. The trial court erred when it denied Baldridge's unopposed motion to leave the case open or to continue the trial so that proof sufficient to establish the lost note could be presented.

5. The trial court erred in its interpretation of the Partnership Agreement between Baldridge and Gutierrez.

## OPINION

### *A & A's Assignments of Error*

The first four assignments of error address A & A's claim against Mr. Gutierrez and will be considered together. However, we choose not to consider them in the order in which they are presented.

### *Assignment of Error Numbers Three and Four*

These assignments of error address the trial court's refusal to allow A & A to introduce a copy of the collateral promissory note at trial, and its refusal to leave the record open to allow A & A the opportunity to remedy the defect in the offering as recognized by the trial court. We find no error in either of these assignments.

8

The trial court rejected A & A's offering based on La.R.S. 13:3741, which provides in pertinent part that "[i]n every case where a lost instrument is made the foundation of a suit or defense, it must appear that the loss has been advertised within a reasonable time in a public newspaper and proper means taken to recover the possession of the instrument[.]" A & A acknowledges through the testimony of Mr. Baldridge that it does not have the original note, has no knowledge of its whereabouts, and did not comply with the advertisement provisions of La.R.S. 13:3741 before attempting to introduce it into evidence. In fact, despite A & A's assertion in its petition that it was the holder and owner of a promissory note executed by Mr. Gutierrez and secured by a collateral mortgage, Mr. Baldridge testified that he never acquired possession of the note on behalf of A & A. The trial court did not err in refusing to allow the copy of the collateral promissory note to be introduced into evidence.

Nor do we find that the trial court erred in refusing to allow the record to remain open for further filings by A & A.[4] This request for relief ignores Mr. Baldridge's testimony to the effect that A & A never had possession of the original collateral promissory note. Therefore, he cannot now assert that he has lost what he never had and it would be a vain and useless act to hold the record open.

*Assignment of Error Number Two*

In this assignment of error, A & A asserts that the trial court erred in concluding that A & A failed to establish the existence of the debt owed to it by Mr. Gutierrez. Taking this assignment in context with all the other assignments, and in particular with the assertions in the first assignment of error, we interpret the merit of this assignment of error within the context of its specific allegations in the pleadings. As previously noted, those pleadings assert a cause of action based on a promissory

---

[4] The brief on appeal suggests that this is Mr. Baldridge's assignment of error, but it addresses only the claim asserted by A & A.

9

note secured by the property described in the May 19, 2006, collateral mortgage executed by Mr. Gutierrez.

The supreme court has explained the nature of the collateral mortgage as follows:

> The collateral mortgage, though now recognized by statute, is a form of conventional mortgage that was developed by Louisiana's practicing lawyers and has long been recognized by Louisiana courts. *Levy v. Ford*, 41 La.Ann. 873, 6 So. 671 (La.1889); *Merchants' Mut. Ins. Co. v. Jamison*, 25 La.Ann. 363 (La.1873); *Succession of Dolhonde*, 21 La.Ann. 3, 1869 WL 4559 (La.1869). The collateral mortgage arose out of the need for a special form of mortgage to secure revolving lines of credit and multiple present and future cross-collateralized debts for which there was no provision in the Civil Code. David S. Willenzik, *Future Advance Priority Rights of Louisiana Collateral Mortgages: Legislative Revisions, New Rules, and a Modern Alternative*, 55 La. L.Rev. 1, 7 (1999). The collateral mortgage was designed "to create a mortgage note that can be pledged as collateral security for either a pre-existing debt, or for a debt created contemporaneously with the mortgage, or for a future debt or debts, or even for a series of debts." Max Nathan, Jr. & H. Gayle Marshall, *The Collateral Mortgage*, 33 La. L.Rev. 497 (1973). One advantage it holds for creditors is that liabilities are ranked from the date of the original pledge of the collateral mortgage note (assuming the mortgage has been recorded), rather than from the date of the individual, subsequent advances. Further, the creditor is able to secure multiple present and future loans and obligations on a cross-collateralized basis.

> This Court discussed the fundamentals of a collateral mortgage in *First Guaranty Bank v. Alford*, 366 So.2d 1299, 1302 (La.1978), as follows:

>> A mortgage is an accessory right which is granted to the creditor over the property of another as security for the debt. La.Civ.Code arts. 3278, 3284. Mortgages are of three types: conventional, legal and judicial. La.Civ.Code art. 3286. Within the area of conventional mortgages, three different forms of mortgages are recognized by the Louisiana statutes and jurisprudence: an "ordinary mortgage" (La.Civ.Code arts. 3278, 3290); a mortgage to secure future advances (La.Civ.Code arts. 3292, 3293); and a collateral mortgage. *See Thrift Funds Canal, Inc. v. Foy*, 261 La. 573, 260 So.2d 628 (1972). Unlike the other two forms of conventional mortgages, a collateral mortgage is not a "pure" mortgage; rather, it is the result of judicial recognition that one can pledge a note secured by a mortgage and use this pledge to secure yet another debt.

>> A collateral mortgage indirectly secures a debt via a pledge. A collateral mortgage consists of at least three documents, and takes several steps to complete. First, there

is a promissory note, usually called a collateral mortgage note or a "ne varietur" note. The collateral mortgage note is secured by a mortgage, the so-called collateral mortgage. The mortgage provides the creditor with security in the enforcement of the collateral mortgage note.

Up to this point, a collateral mortgage appears to be identical to both a mortgage to secure future advances and an ordinary mortgage. But a distinction arises in the collateral mortgage situation because money is not directly advanced on the note that is paraphed for identification with the act of mortgage. Rather, the collateral mortgage note and the mortgage which secures it are *pledged* to secure a debt.

366 So.2d at 1302 (emphasis in original).

Pledge is an accessory contract by which one debtor gives something to a creditor as security for the debt. La.Civ.Code art. 3133; *Texas Bank of Beaumont v. Bozorg*, 457 So.2d 667, 671 n. 4 (La.1984). Invariably, the thing given as security for the debt is a movable, in which case the contract is more accurately called pawn. La.Civ.Code arts. 3134 and 3135. A person may give a pledge not only for his own debt, but also for that of another. La.Civ.Code art. 3141. The pledge secures only that debt or debts contemplated in the contract between the pledgor and pledgee. *Alford*, 366 So.2d at 1304 (quoting *Durham v. First Guaranty Bank of Hammond*, 331 So.2d 563, 565 (La.App. 1st Cir.1976)); *see also* Peter S. Title, *Louisiana Real Estate Transactions*, Second Edition, § 14.9 (2000).

A collateral mortgage is not a "pure" mortgage; instead, it combines the security devices of mortgage and pledge into one. *First Federal Savings & Loan Ass'n v. Moss*, 616 So.2d 648, 654 (La.1993). It is important to remember that the collateral mortgage does not directly secure a debt; instead, the collateral mortgage device "is designed to create a mortgage note for a fictitious debt that can be pledged as collateral security for a real debt." *Bozorg*, 457 So.2d at 671; see also David S. Willenzik, *Louisiana Secured Transactions*, § 2:13 (2000) ("The borrower's mortgage secures a fictitious collateral mortgage note, which is payable to bearer on demand. The collateral mortgage note is then pledged under a collateral pledge agreement to secure the borrower's true indebtedness under one or more hand notes."). Because the mortgagor, after executing the collateral mortgage and the collateral mortgage note, then pledges the collateral mortgage note as security for a debt, usually represented by a separate hand note, the collateral mortgage package combines the security devices of pledge and mortgage. *Bozorg*, 457 So.2d at 671 (citing Nathan & Marshall, *The Collateral Mortgage*, 33 La.L.Rev. at 498).

*Diamond Services Corp. v. Benoit*, 00-0469, pp. 5-9 (La. 2/21/01), 780 So.2d 367, 370-72 (footnotes omitted).

In the matter now before us, A & A not only failed to produce the original collateral promissory note, but it also failed to produce the promissory note to which the collateral promissory note should have been pledged as security. Therefore, we find no merit in this assignment of error.

*Assignment of Error Number One*

In this assignment of error, A & A asserts that even if one should conclude that it failed to meet its burden of proof regarding the cause of action raised in its pleadings, the other evidence sufficed to support a breach of contract claim which should have been considered by the trial court. Specifically, A & A asserts that its prayer for "all general and equitable relief" together with the language of La.Code Civ.P. art. 862 allows it to assert a breach of contract theory separate and apart from the suit on note with security claim made in its petition.

In ordinary proceedings "[n]o technical forms of pleadings are required." La.Code Civ.P. art. 854. Still, "[a]ll allegations of fact of the petition . . . shall be simple, concise, and direct, and shall be set forth in numbered paragraphs. As far as practicable, the contents of each paragraph shall be limited to a single set of circumstances." *Id.* Additionally, the petition "*shall* contain a short, clear, and concise statement of all causes of action arising out of, and of the material facts of, the transaction or occurrence that is the subject matter of the litigation[.]" La.Code Civ.P. art. 891(A) (emphasis added).

A & A argues that, notwithstanding the mandate of La.Code Civ.P. art. 891(A) that the petition shall state all causes of action arising out of the transaction at issue, La.Code Civ.P. art. 862 allows it to rely on the less specific language of its prayer in allowing evidence on a cause of action not stated. Louisiana Code of Civil Procedure Article 862 provides:

> Except as provided in Article 1703, a final judgment shall grant the
> relief to which the party in whose favor it is rendered is entitled, even if

12

the party has not demanded such relief in his pleading and the latter contain no prayer for general and equitable relief.

Nevertheless, "when the party's failure to request a particular form of relief, and the party's trial conduct, improperly and substantially prejudice its adversary's presentation of a defense, it is not entitled to relief under this rule." *T. L. James & Co., Inc. v. Kenner Landing Inc.*, 562 So.2d 914, 915 (La.1990). Louisiana Code of Civil Procedure Article 862 has as its goal "to enable all litigants to make the same realistic appraisal of the case, so that settlement and litigation strategy are based on knowledge and not speculation." *Id*. at 918.

In making its argument to this court that it should be able to rely on La.Code Civ.P. art. 862 to expand its pleadings to assert a separate cause of action, A & A does not cite the phrase "Except as provided in Article 1703. . . ." to the court. Louisiana Code of Civil Procedure Article 1703 refers to a situation where a plaintiff is attempting to obtain a judgment by default and provides that such a judgment "*shall not be* different in kind from that demanded in the petition." (emphasis added). While that Article could probably be applied by analogy given the failure of Mr. Gutierrez to appear at trial, we find La.Code Civ.P. art. 1154 to be more compelling. That Article provides in pertinent part that "[w]hen issues not raised by the pleadings are tried *by express or implied consent* of the parties, they shall be treated in all respects as if they had been raised by the pleadings." (emphasis added). In the matter now before us, there was neither express nor implied consent to enlarge the pleadings because neither Mr. Gutierrez nor his counsel was present to consent or waive objection.

We do not find that La.Code Civ.P. art. 862 supports A & A's position on this issue and find no merit in this assignment of error.

### *Mr. Baldridge's Assignment of Error*

This final assignment of error addresses Mr. Baldridge's attempt to secure a judgment for amounts he claims are due under the July 17, 2007, partnership agreement. That agreement reads in pertinent part as follows:

> [David M. Baldridge and Edward D Gutierrez] hereby enter into a business partnership agreement as outlined below:
>
> Both parties are working and participating individuals in A & A CONSTRUCTION LLC, a Louisiana Limited Liability Corporation which is registered in the State of Louisiana with DAVID M. BALDRIDGE as the owner and registered agent of said corporation.
>
> This agreement includes all activities of A & A Construction LLC as well as all activities generated from A & A Insulation, REAL Inspections and Safehouse Technologies LLC and A & A Pest control of La.
>
> IT IS HEREBY AGREED that all assets and liabilities owned by A & A Construction will be shared equally by both parties excluding the 2001 Ford F250 pick-up VIN # 1FTNW20S81ED39045, the 1999 Ford F150 pick-up VIN # 1FTRX17W4XKA25565, and the 1997 Chevrolet S-10 pick-up VIN # 1GCCS1945V8148107.
>
> IT IS FURTHER AGREED that any purchases and/or transactions conducted by A & A Construction LLC and any of the aforementioned entities in excess of $3,000.00 will be determined by both parties herein unless either party is not available to consult prior to the need of a decision being made.
>
> IT IS FURTHER AGREED by both parties that this agreement will be deemed null and void if either party herein does not perform his equal share of the marketing of services and management of day to day operations of said corporation and does not contribute a minimum of thirty five (35) hours per week to the operations of said company.
>
> IT IS FURTHER AGREED that all expenses incurred by A & A CONSTRUCTION LLC will be deducted and profit and loss statement will be provided before any proceeds of profits will be paid to either party herein.
>
> IT IS FURTHER AGREED that if A & A CONSTRUCTION LLC should cease its operations and shut down all facilities, that a statement of liabilities will be provided by a non-participating party in this agreement and each party herein agrees to pay fifty percent (50%) of any outstanding debts either through his share of any funds remaining in the accounts of A & A CONSTRUCTION LLC and if there are no funds available through the accounts of said company, each individual will pay 50% of the debts outstanding until all debts have been satisfied.

14

In rejecting Mr. Baldridge's claim for reimbursement, the trial court stated the following:

> Well, I've read the document. And, based on the document, I find that you have failed to prove by a preponderance of the evidence that Mr. Gutierrez, at this point, is responsible for any of the debts of A&A Construction, because your agreement says that the partnership is going to be nullified when the other party does not perform his share.
>
> And the only provision for payment of outstanding indebtedness comes when the business ceases, which there's been no evidence that it ceased. So I'm denying any recovery on the basis of indebtedness owed to the partnership.

Mr. Baldridge asserts that regardless of the ongoing nature of A & A, the partnership terminated at the end of April 2008 when Mr. Gutierrez ceased coming to work and that this event gave rise to an accounting.

A partnership as defined by La.Civ.Code art. 2801 "is a juridical person . . . created by a contract[.]" As such, it is to be interpreted pursuant to the rules governing the interpretation of contracts and the principle determination "is the determination of the common intent of the parties." La.Civ.Code art. 2045. To that end, "[w]hen the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." La.Civ.Code art. 2046.

With regard membership within a partnership, La.Civ.Code art. 2818(B) provides in pertinent part that "[a] partner also ceases to be a member of a partnership in accordance with the provisions of the contract of partnership." Louisiana Civil Code Article 2826 provides that included within the ways a partnership is terminated is the situation where it "terminates in accordance with provisions of the contract" as well as by "the reduction of its membership to one person." Additionally, "[w]hen a partnership terminates, the business of the partnership ends except for the purpose of liquidation." La.Civ.Code art. 2828.

15

We interpret the partnership agreement to mean that the partnership may be terminated in either of two ways: (1) when A & A ceases operations and shuts down all of its facilities, or (2) when either of the partners ceases to perform his duties under the agreement and fails to contribute a minimum of thirty-five hours per week to the partnership activity associated with the operation of A & A. The first means of termination provides a specific method of satisfying the obligation to contribute to the outstanding debts arising from the partnership operation, while the second is silent as to how the partnership debts would be satisfied.

With regard to the first reason for termination, the trial court correctly concluded that Mr. Baldridge could not rely on that language in the agreement because A & A had not yet ceased operations, nor was there any evidence that it shut down its facilities. It simply merged into another legal entity: David Baldridge, Incorporated. The trial court read the performance requirement in conjunction with A & A operational status and concluded that Mr. Baldridge could not maintain his action until A & A ceased its operations and shut down its facilities even though Mr. Gutierrez had ceased to perform pursuant to the agreement. Thus, without specifically saying so, the trial court concluded that Mr. Baldridge did not yet have a cause of action against Mr. Gutierrez for contribution to the debts of the partnership. La.Code Civ.P. art. 927(A)(5). The trial court can raise the peremptory exception of no cause of action on its own motion. La.Code Civ.P. art. 927(B).

We find, however, that the trial court erred in failing to find that the partnership terminated when Mr. Gutierrez ceased contributing thirty-five hours per week to its operation through A & A. Louisiana Civil Code Article 2050 provides that "[e]ach provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole." Thus, the error before us is not a factual error governed by the manifest error/clearly wrong standard of review as set forth in *Rosell v. ESCO*, 549 So.2d 840 (La.1989); contractual interpretation

16

questions are questions of law which require a *de novo* review of the evidence presented. *Boykin v. PG Industries, Inc.*, 08-117 (La.App. 3 Cir. 6/18/08), 987 So.2d 838, *writ denied*, 08-1640 (La. 10/31/08), 994 So.2d 537. Our *de novo* review of the matter before us leads us to conclude that Mr. Baldridge has failed to meet his burden of proof.

According to the partnership agreement, Mr. Gutierrez's failure to perform his obligations rendered the partnership agreement "null and void."[5]; the agreement fails to provide the method of liquidation in the event a partner fails to perform. "In the absence of contrary agreement, a partnership is liquidated in the same manner and according to the same rules that govern the liquidation of corporations." La.Civ. Code art. 2834. The specific procedure for the liquidation of a corporation is found in Part XIV of the Louisiana Corporation Law, La.R.S. 12:141, *et seq.* Neither party to this litigation made any effort to comply with that procedure. In fact, the difficulty in evaluating the claims of each litigant is that they have ignored, in both operation and termination, the juridical personal nature of their partnership, of A & A, and of the other three limited liability companies listed in the partnership agreement. They have treated these entities simply as vehicles of convenience and flow-through entities for their own business activities. However, there are no procedural exceptions before us on appeal, and we will treat the remaining issue as the parties have – a dispute between two litigants that happens to flow through a number of juridical persons.

When Mr. Baldridge forwarded Mr. Gutierrez the August 13, 2008, demand letter, he claimed a balance owed of $62,324.80. Although there is some confusion concerning exactly what was attached to the letter, he did attach at least one page purporting to justify the balance demanded. On that single sheet of paper, he did not

---

[5] This represents an unfortunate phraseology choice in the partnership agreement. Black's Law Dictionary defines this phrase as "a common redundancy, and states that the use of the adjective "null" refers to something as "[h]aving no legal effect: without binding force; VOID." To interpret the contract in this context would lead to an absurd consequence. As mandated by La.Civ. Code art. 2045, we look to the common intent of the parties and interpret this phrase to mean that the partnership agreement is terminated at this point rather than being declared of no legal effect.

detail the individual liabilities of A & A, but combined them and asserted one half of the company's negative net worth was $68,604.80, and that after some minor adjustments shown on the attachment, Mr. Gutierrez's share was $62,324.80, the amount asserted in the demand letter.

Ms. Miller testified that an additional four-page document was also attached to the demand letter which better itemized the sources of the figure representing A & A's negative net worth. In addition to a more detailed summary sheet, the second document included a page setting forth the individual accounts payable (totaling $179,530.06), a page setting forth the total accounts receivable as well as cash on hand (totaling $9,205.46), and a page listing A & A's equipment and product inventory ($33,115.00). However, Ms. Miller also testified that an additional six-page document exists, which was prepared sometime after the four-page document and purports to show payments made by A & A on the debts listed on that four-page document. The preparation of this document resulted in an adjustment of A & A's negative net worth upward to $184,678.82, thereby adjusting Mr. Gutierrez's share upward to $92,339.39.

The record clearly establishes that A & A was a functioning company long before the partnership was formed, yet we are provided with no base line by which to evaluate the difference between the company worth on July 17, 2007, and its worth on April 30, 2008. Further, no effort has been made by Mr. Baldridge to differentiate between the A & A expenses associated with the partnership and its other endeavors, nor did he set forth the activity of the other three companies listed in the partnership agreement despite the fact that two of the three are listed under the accounts receivable page of the four-page exhibit. In fact, that same page suggests that an accounts receivable item from A & A to itself exists.

The four-page exhibit lists accounts payable in the amount of $179,530.06 as of April 30, 2008, and a total of $9,205.46 as cash on hand and accounts receivable on

18

the same date. However, the six-page exhibit not only suggests significant upward changes to the accounts payable, but also asserts that over the next year, A & A paid in excess of $76,000.00 on these debts while asserting that on April 30, 2008, it had slightly over $9,000.00 in liquid assets on hand. There is no explanation in the record of what caused this financial windfall over such a short period of time in what is purported to be a failed company. Simply stated, we find that Mr. Baldridge failed to present sufficient evidence to support his claim.

## DISPOSITION

For the foregoing reasons, we affirm the trial court's judgment in favor of Edward D. Gutierrez and against David M. Baldridge, dismissing Mr. Baldridge's claims in full. We assess all costs of this appeal to David M. Baldridge.

**AFFIRMED.**